**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PAUL BRYAN and BONNIE BRYAN, )
husband and wife, individually and as )
parents and natural guardians on behalf of )
their minor child, KB and KB, )
　　　　　　　　　　　　　　　　　 )
　　　　Plaintiffs, )
　　　　　　　　　　　　　　　　　 )
　　　　v. )　　　C.A. No. 03-259 Erie
　　　　　　　　　　　　　　　　　 )
ERIE COUNTY OFFICE OF CHILDREN )
& YOUTH, et al., )
　　　　　　　　　　　　　　　　　 )
　　　　Defendants. )

## OPINION

Presently pending before the court are numerous motions to dismiss and motions to dismiss and/or for summary judgment. For the reasons set forth below, the motions to dismiss plaintiffs' § 1983 claims will be granted for failure to state claims upon which relief can be granted. Portions of the state law claims will be dismissed as well, as is more fully explained below. As to the remaining state law claims, the Court declines to exercise supplemental jurisdiction over such claims under 28 U.S.C. § 1367(c)(3), and the claims will be transferred to state court pursuant to 42 Pa. C.S.A. § 5103.

## I. Background

This action arises out of an alleged sexual assault by J.O., a minor foster child placed in the home of plaintiffs Paul and Bonnie Bryan ("Bryans"). The Bryans are suing individually and as parents and natural guardians of their son, K.B., the victim of the alleged assault. The Bryans were licensed as foster parents through defendant Bethesda Children's Home ("Bethesda"), and with defendant Erie County Office of Children & Youth ("ECOCY"). Complaint ¶ 30. ECOCY placed J.O., previously adjudicated as a dependent, in the Bryan's home under the ECOCY's "host family" plan. The initial placement included overnight and weekend visits at the Bryans' home from

1

December 24, 2000 through March 30, 2001. Complaint ¶ 36. J.O. had previously been placed at defendant Harborcreek Youth Services, a residential and treatment facility for children, through the ECOCY. Complaint ¶ 33.

On March 28, 2001, two other minor children, R.S. and T.S., were designated as pre-adoptive placements with the Bryans through Mercer County Children and Youth Services and Defendant Bethesda. Complaint ¶ 38. Two days later, on March 30, 2001, J.O. was permanently placed at the Bryans' home. It is alleged that when Paul Bryan traveled to pick J.O. up at Harborcreek on that day, he informed Harborcreek personnel (including defendant Kleiner, a Harborcreek therapist) that the Bryans had accepted the two pre-adoptive children (R.S. and T.S.) and asked if there was any reason why J.O. should not go home with him. Plaintiffs allege that Harborcreek personnel assured Mr. Bryan that there was no reason J.O. should not be placed with the Bryans. Complaint ¶ 40.

On August 12, 2001, the Bryans' son, K.B., then age 9, reported that he had been the victim of certain assaults by J.O., who at the time was 14. Complaint ¶ 33, 35, 43. The next day J.O. was removed from the Bryans' home. Complaint ¶ 45. Soon thereafter, K.B. disclosed that the assaults by J.O. had begun as early as December, 2000 or January, 2001, and that J.O. had repeatedly committed various sexual and violent acts against him, including anal penetration. Complaint ¶ 46.

Plaintiffs aver that Harborcreek and the ECOCY Defendants did know or should have known of J.O.'s sexually abusive and violent behavior toward others and that J.O. posed a serious risk of harm to the minor children in the Bryans' home. Complaint ¶ 20, 59. Plaintiffs allege that Harborcreek, its employees, and the ECOCY Defendants should have either disclosed their actual knowledge of J.O.'s propensities, or should have investigated J.O.'s history, and they should have warned the Bryans and provided them with a safety plan. Complaint ¶ 48-50, 60, 61. Plaintiffs allege that the ECOCY Defendants failed to meet their obligation to perform risk assessments of J.O. relating to his placement; they allege that in the event those tasks were performed, the ECOCY Defendants deliberately or recklessly disregarded or failed to disclose the information set forth in

2

these assessments to the Plaintiffs. Complaint ¶ 56, 57. Plaintiffs further allege that the ECOCY Defendants engaged in a policy, practice and custom of failing to perform risk assessment with respect to foster children in their custody and control and/or failing to advise or disclose the results of the risk assessments to foster parents. Complaint ¶ 64.

The Complaint divides the causes of action into two broad sections, "First Factual Background" and "Second Factual Background." The First Factual Background encompasses paragraphs 30 to 82 of the Complaint and is concerned with the placement of J.O. in the plaintiffs' home and the harm which he caused to the Bryans and their minor child, K.B. This first portion of the Complaint contains four causes of action. Count I of the Complaint alleges violations of civil rights under 42 U.S.C. § 1983 against ECOCY, certain individual employees of ECOCY, (including defendants Paul Cancilla, Director of Placements, Carmen Merritt, Supervisor of Foster Family Care Resources, Renie Skalko, caseworker, Cindy Baxter, caseworker supervisor, Cindy Lewis, caseworker, employees Barry Kohler and Brigitte Sullivan, and John Petulla, Director of the Bureau of County Children & Youth Programs for the Pennsylvania DPW), Harborcreek, an employee of Harborcreek (defendant Merritt Lynn Kleiner, a therapist), the Pennsylvania Department of Public Welfare ("DPW"), the Department of Public Welfare, Western Region Office, Office of Children, Youth and Families ("WROCYF), and an employee of WROCYF, defendant Michael Kazmer (collectively, the "Commonwealth defendants"). Complaint ¶¶ 74, 75. Count II alleges intentional infliction of emotional distress against these same defendants. Complaint ¶¶ 76, 77. Count III alleges negligence per se against ECOCY and Harborcreek, and Count IV alleges assault and battery against ECOCY Defendants and the Harborcreek Defendants. Complaint ¶¶ 78 - 82.

The Second Factual Background is comprised of paragraphs 83 through 134 of the Complaint and concerns allegations of child abuse which were filed against the Bryans after the first reported incident of abuse by J.O. on K.B. Plaintiffs allege that two months after K.B.'s initial

3

disclosure of the alleged assaults, they were told on October 17, 2001 that a Childline report[1] for child abuse by omission had been filed against them. Complaint ¶¶ 96, 98. The report alleged that the Bryans were at fault for failing to protect K.B. from J.O. Complaint ¶ 96. After this first report was filed, the minor, pre-adoptive children R.S. and T.S. were removed from the Bryan home. Complaint ¶ 96, 97. Plaintiffs allege that defendant Kazmer, an employee of WROCYF, failed to conduct a fair, objective or good faith investigation into the Childline allegation against the Bryans for perpetration by omission. Complaint ¶ 107.

Plaintiffs further allege that defendant Bethesda and a Bethesda supervisor, Elizabeth Mallory (collectively, the "Bethesda Defendants") filed a second, unfounded Childline report regarding the Bryans' use of a toddler safety harness on R.S. Complaint ¶ 99. They allege that at the same time, Ms. Mallory advised the Bryans that they should not worry about this second Childline report because both Bethesda and Mercer County Children and Youth Services were aware of the use of the toddler safety harness and had approved its use. Complaint ¶ 99. Upon a complete investigation regarding the use of the harness, the WROCYF determined that the allegations in the second report were "unfounded." Complaint ¶ 102. Ultimately, however, the state court judge refused to return T.S. and R.S. to the Bryan home, and Bethesda and ECOCY decertified the Bryans based upon their violations of regulations set forth in Bethesda's Foster Parent Manual and the Pennsylvania Code. Complaint ¶ 109.

The Complaint alleges that Michael Kazmer, an employee of DPW who was assigned to investigate the first Childline complaint, failed to conduct a fair, complete, and objective investigation and improperly found the report of the alleged child abuse by omission to be "indicated." Complaint ¶¶ 107, 112, 113, and 118. Plaintiffs allege that Mr. Kazmer and WROCYF

---

[1] The Department of Public Welfare's (DPW) ChildLine and Abuse Registry is the central clearinghouse for all investigated reports. Professionals who come into contact with children are required to report when they have reasonable cause to suspect that a child coming before them in their professional capacity is an abused child. In addition, any person may report suspected abuse, even if the individual wishes to remain anonymous. Child Abuse Annual Report 2003, Pennsylvania Department of Public Welfare; 23 Pa. C.S.A. § 6332.

violated DPW regulations by failing to timely file form CY-48 and by failing to find that the Childline report as "unfounded." Complaint ¶ 118. The Complaint further alleges once the plaintiffs filed an appeal from the finding that child abuse by omission was "indicated," John Petulla, the director of the Bureau of County Children and Youth Programs of DPW, declined plaintiff's request to administratively expunge the indicated report and instead directed that the plaintiffs' appeal be heard by an administrative law judge. Complaint ¶¶ 111, 121, 122.

The Complaint further alleges:

> Mr. Petulla was assigned this appeal as DPW Director of the Bureau of County Children and Youth Programs notwithstanding the fact that he had been the Director of ECOCY at the time J.O. was placed in the Bryan home and at the time ECOCY and the other named Defendants failed to inform the Bryans of J.O.'s history. The foregoing dual roles of John Petulla created a conflict of interest.

> At all times ... the actions of the Bethesda ECOCY, WROCYF and DPW Defendants were undertaken with deliberate indifference and in reckless disregard of the rights of Plaintiffs to be free from false and accusatory statements concerning their actions as foster parents.

> At all times ... it is believed and averred that the actions of the Bethesda, ECOCY, WROCYF and DPW Defendants were undertaken deliberately and/or recklessly for purposes of discrediting and harming the Plaintiffs, making the Plaintiffs appear to be unfit foster parents, and to conceal the failures of the respective Defendants with respect to the placement of J.O. with Plaintiffs.

Complaint ¶¶ 122, 123, and 125. Plaintiffs further allege that as a result of their decertification as a foster care home and the removal of R.S. and T.S. from their home, Mrs. Bryan can no longer be employed as a registered nurse. Complaint ¶ 126.

The Second Factual Background alleges four more causes of action. Counts V through VIII allege acts and/or omissions by various defendants following K.B.'s disclosure of the sexual assault on August 12, 2001. Count V alleges constitutional violation of substantive due process in violation of 42 U.S.C. § 1983 against the Bethesda Defendants, the ECOCY Defendants and the DPW Defendants. Complaint ¶¶ 127, 128. Plaintiffs allege that these defendants violated their right to family integrity and economic security. Omnibus Br. of Pls. at Tab 7, p. 9. Count VI alleges intentional infliction of emotional distress against Bethesda, ECOCY, DPW and WROCYF Defendants. Complaint ¶¶ 129. Count VII alleges defamation against Bethesda, ECOCY, DPW and

5

WROCYF Defendants. Complaint ¶¶ 130-132. Finally, Count VIII alleges conspiracy against Bethesda, ECOCY, WROCYF and DPW Defendants; plaintiffs allege that these entities engaged in a cover-up of their own mistakes by filing false or unfounded Childline reports and by targeting the Bryans in the decertification process. Complaint ¶¶ 133-134.

By way of further background, and for the purpose of resolving certain arguments regarding issue preclusion, abstention, and jurisdiction, we note the following procedural history. After the allegations of child abuse by omission were made, and after a hearing, on September 5, 2003, Administrative Law Judge Maria Greco issued a nine page Adjudication recommending that plaintiffs' appeal be denied; therefore, the finding of child abuse by omission remained on the record. Appendix B to Commonwealth Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc. 33) (hereinafter, "the ALJ Opinion"). The ALJ found that prior to placement of J.O. in plaintiffs' home, the plaintiffs were explicitly apprised of J.O.'s sexually inappropriate behaviors which he had previously exhibited while in foster care and that the plaintiffs agreed to provide J.O. with his own room with an alarm on the door. The ALJ Op. at 3. She also found that plaintiffs were advised that J.O.'s residential treatment plan required him to attend sex education classes as well as a sex offender group meeting and that the Bryans had willfully disregarded the warnings which they had been given concerning J.O. and that they were guilty of child abuse by omission. The ALJ Opinion at 3-4, 9. This recommendation was adopted by the Bureau of Hearings and Appeals of DPW. Appendix B to Commonwealth Defendants' Motion to Dismiss or, in the Alternative, Motion for Summary Judgment (Doc. 33).

We also note that as to the decertification issue, on April 19, 2005, Administrative Law Judge Greco filed a separate recommendation on behalf of the Department of Public Welfare of the Commonwealth of Pennsylvania in which she recommended that the Bryan's appeal be denied and determined that the Bethesda Children's Home had properly decertified the Bryans' home as a foster care home. The ALJ framed the issue as follows: "The issue is whether Bethesda Children's Home was correct to decertify Appellants' home as a foster family home on the grounds Appellants

6

violated certain provisions of the Pennsylvania Code as well as provisions of Bethesda Children's Services, the agency which had certified Appellants' home as a foster family home." Ex. A to Supplement to Motion to Dismiss (Doc. 44) at 2. ALJ Greco opined that the Bryans had violated the confidentiality of R.S. and T.S. when they wrote a letter to the director of the Bureau of Hearings and Appeals and carbon-copied six Pennsylvania legislators; the letter apparently disclosed that R.S. used to take anti-psychotic drugs. Id. at 9. The disclosure to the legislators, according to the ALJ, violated Bethesda's privacy regulation and the Pennsylvania Code. Id. at 9-10.

The plaintiffs requested the Secretary of DPW to reconsider that decision, and on October 27, 2005, the Secretary of the Pennsylvania Department of Public Welfare upheld the agency's decision to revoke the Bryans' certification as a foster care home. Plaintiffs' appeal to the Commonwealth Court of Pennsylvania is currently pending. See "Status Report Pursuant to Court Order Dated February 6, 2006" (Doc. 52) at ¶ 1.

At the same time this federal action was begun, plaintiffs filed a separate, parallel civil action in the Court of Common Pleas of Crawford County; that action remains open, although, as far as we are able to discern, pleadings have not been filed and that case has been stayed pending resolution of this federal lawsuit. Id. at ¶ 2.

We have jurisdiction over the federal claims pursuant to 28 U.S.C. §§ 1331, 1343 and supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## II. Standard

In analyzing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), we are "required to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant." Weston v. Pennsylvania, 251 F.3d 420, 425 (3d Cir. 2001); Rocks v. City of Philadelphia, 868 F.2d 644, 645 (3d Cir. 1989). In determining whether a claim should be dismissed under Rule 12(b)(6), we may

7

look only to the facts alleged in the complaint and its attachments without reference to other parts of the record. Moreover, a case should not be dismissed for failure to state a claim unless it clearly appears that no relief can be granted under any set of facts that could be proved consistently with the plaintiff's allegations. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984). In considering a motion to dismiss, the court is not deciding the issue of whether a plaintiff will ultimately prevail, but is deciding if the plaintiff is entitled to offer evidence to support its claims. Lake v. Arnold, 112 F.3d 682 (3d Cir. 1997). However, the court is not required to accept as true legal conclusions or unwarranted factual inferences. Schuylkill Energy Res., Inc. v. Pennsylvania Power & Light Co., 113 F.3d 405, 417 (3d Cir. 1997).

Certain Defendants have filed motions to dismiss for lack of subject matter jurisdiction under the Rooker-Feldman doctrine which is discussed in detail below. The Court will treat Defendants' motion as a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1). See Fed. R. Civ. P. 12(b)(1); see also 19th Street Baptist Church v. St. Peter's Episcopal Church, No. Civ. A. 99-CV-5085, 2003 WL 22849592, at *2 (E.D.Pa. Nov. 26, 2003) (applying Rule 12(b)(1) to motion to dismiss for lack of jurisdiction under Rooker-Feldman doctrine); Hanover Group, Inc. v. Manufactured Home Communities, Inc., No. IP00-0739-C-T/G, 2000 WL 1124877, at *2 (S.D.Ind. Jul. 12, 2000) ( "A Rooker-Feldman defense should be presented through a motion to dismiss pursuant to Rule 12(b)(1)."). When subject matter jurisdiction is challenged under 12(b)(1), the plaintiff has the burden to show that the court has the requisite jurisdiction to hear the case. Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005). Further, the district court "may not presume the truthfulness of plaintiff's allegations, but rather must evaluat[e] for itself the merits of [the] jurisdictional claims." Id., citing Mortensen v. First Fed. Savings & Loan Ass'n., 549 F.2d 884, 891 (3d Cir.1977).

## III. Discussion

Prior to our analysis of the pending motions, we note that the plaintiffs concede that their cause of action against the Commonwealth of Pennsylvania, Department of Public Welfare

8

("DPW"), and its division Western Region Office of Children, Youth and Families ("WROCYF")
should be dismissed on the grounds of Eleventh Amendment immunity. Omnibus Br. of Pls. at Tab
7, p. 3; Atascadero State Hospital v. Scanlon, 473 U.S. 234 (1985), Pennhurst State School &
Hospital v. Halderman, 465 U.S. 89, 98 (1984). We will enter an appropriate order dismissing the
DPW and WROCYF from this action.

## A. COUNTS I and V: Section 1983

### 1. Rooker-Feldman Doctrine and Pullman Abstention

Defendants Michael Kazmer, and John Petulla, employees of Commonwealth of
Pennsylvania, Department of Public Welfare, who are being sued in their individual and official
capacities, argue that under the Rooker-Feldman[2] doctrine, we cannot entertain constitutional claims
that have been previously adjudicated in state court or that are inextricably intertwined with the state
adjudication. They also argue in the alternative that we should abstain from deciding those same
issues which have been presented to the state court, pursuant to the Pullman abstention doctrine.
Their argument is limited to the state proceeding which involved the DPW and its employees – as
alleged in the Second Factual Background – the finding that the allegation of child abuse by
omission was "indicated." Likewise, the Bethesda Defendants have filed a Supplement to Motion to
Dismiss (Doc. 44) in which they request that we stay this action pending the outcome of the Bryan's
appeal from the state administrative agency's determination that decertification of their foster home
was proper.

"The Rooker-Feldman doctrine bars lower federal courts from exercising jurisdiction over a
case that is the functional equivalent of an appeal from a state court judgment." Marran v. Marran,
376 F.3d 143, 149 (3d Cir. 2004). "The Rooker-Feldman doctrine is based on the statutory
foundation of 28 U.S.C. § 1257 and the well-settled understanding that the Supreme Court of the
United States, and not the lower federal courts, has jurisdiction to review a state court decision."

---

[2] District Court of Appeals v. Feldman, 460 U.S. 462 (1983) and Rooker v. Fidelity Trust
Co., 263 U.S. 413 (1923).

9

Parkview Associates Partnership v. City of Lebanon, 225 F.3d 321, 324 (3d Cir. 2000), see also Whiteford v. Reed, 155 F.3d 671, 673 (3d Cir. 1998), Gulla v. North Strabane Township, 146 F.3d 168, 170 (3d Cir. 1998). The Third Circuit describes the Rooker-Feldman doctrine as arising in two circumstances: if the claim was "actually litigated" in the state court or if the claim is "inextricably intertwined" with the state adjudication. Desi's Pizza, Inc. v. City of Wilkes-Barre, 321 F.3d 411, 419 (3d Cir. 2003). Recently, the United States Supreme Court has emphasized the narrow scope of the Rooker-Feldman doctrine, holding that it "is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp. v. Saudi Basic Industries Corp., 544 U.S. 280, 284 (2005).

The individual Commonwealth defendants argue that the plaintiffs' claims have been both "actually litigated" and are "inextricably intertwined." State and federal claims are inextricably intertwined "(1) 'when in order to grant the federal plaintiff the relief sought, the federal court must determine that the state court judgment was erroneously entered' [or] (2) when 'the federal court must... take action that would render that judgment ineffectual.'" Desi's Pizza, 321 F.3d at 421, quoting FOCUS v. Allegheny County Court of Common Pleas, 75 F.3d 834, 840 (3d Cir. 1996). "'If the relief requested in the federal action requires determining that the state court's decision is wrong or would void the state court's ruling, then the issues are inextricably intertwined and the district court has no subject matter jurisdiction to hear the suit.'" Gulla, 146 F.3d at 171, quoting FOCUS, 75 F.3d at 840.

In Desi's Pizza, the United States Court of Appeals for the Third Circuit noted certain factors for determining whether an issue was "actually litigated" by the state courts: a plaintiff must present its federal claims to the state court, and the state court must decide those claims. Id., 321 F.3d at 419. "Ordinarily, it will be more difficult to demonstrate that a claim was "actually litigated" than to show that the federal claim is "inextricably intertwined" with the state court judgment. The

10

former requires that the state court has considered and decided precisely the same claim that the plaintiff has presented in the federal court. Conversely, two claims may proceed on different theories or involve different parties and yet be inextricably intertwined if the District Court's judgment would "prevent a state court from enforcing its orders." ITT Corp. v. Intelnet Int'l Corp., 366 F.3d 205, 211 at n. 8 (3d Cir. 2004). "The actually litigated prong is principally useful where the claims before the state and federal courts are in all respect identical. In such cases, the straightforward application of the "actually litigated" test avoids the more complicated "inextricably intertwined" inquiry. Id.

Plaintiffs allege that the DPW and its employees failed to conduct a fair and complete investigation, that there was a conflict of interest, that the defendants acted deliberately and recklessly in discrediting and harming the plaintiffs in order to conceal the defendants' alleged mistakes in placing J.O. with the Bryans. Upon reviewing the ALJ's opinions– with respect to the allegations of child abuse by omission as well as the decision to decertify– we find that plaintiffs' claims have neither been "actually litigated" nor are "inextricably intertwined" with the prior adjudications. The state court has not been presented with this particular federal claim; should there be an ultimate finding that the defendants herein violated plaintiffs' constitutional rights, this will not necessarily render the state court decision erroneous. Nor can plaintiffs be said to have "fairly and fully" litigated the constitutional claims; the state of mind of parties was not at issue before another court. Ernst, 108 F.3d at 491-92. We will therefore deny the motion to dismiss on the grounds of Rooker-Feldman doctrine.

With respect to Pullman abstention, we decline the request to abstain because none of the requisite special circumstances are present. Biegenwald v. Fauver, 882 F.2d 748 (3d Cir. 1989). By exercising jurisdiction over plaintiffs' federal claims, we will not interfere with the effectual judicial resolution of the plaintiffs' claims currently pending in state court. Plaintiffs' claims herein are separate and distinct from those pending in state court and we are not faced with any uncertain issues of state law. Id. at 750. We will therefore deny the request to abstain from exercising

11

jurisdiction in this matter.

Defendant Bethesda argues that we should stay this action pending the outcome of the plaintiffs' appeal from the order regarding home decertification, citing Colorado River Water Conservation District v. United States, 424 U.S. 800 (1976). In that case, the Supreme Court found that even where none of the other abstention categories applied, federal courts ought to refuse to decide cases when considerations of "wise judicial administration giving regard to conservation of judicial resources and comprehensive disposition of litigation." 424 U.S. 800, at 817. While the Court recognized "the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them which distinguishes cases of federal-state from wholly federal concurrent jurisdiction, it held that in certain limited circumstances, the same considerations of judicial administration justify abstention in the former as in the latter category of cases." Levy v. Lewis, 635 F.2d 960, 965 (2nd Cir.1980). Under this Colorado River doctrine then, abstention may be appropriate in federal cases which are duplicative of a pending state proceeding. Quackenbush v. Allstate Insurance Company, 517 U.S. 706, 717 (1996). We will deny defendant Bethesda's request to abstain from exercising jurisdiction over this action because, first and foremost, we do not view the nature of this action to be duplicative of the decertification issue presently on appeal; and second, we believe judicial economy mandates the reverse: that we address the plaintiff's allegations to the fullest extent possible in order to render a just resolution to this litigation.

Plaintiffs allege that defendants violated their right to family integrity and economic security by falsely decertifying them as a foster care provider. The individual DPW defendants argue that we should dismiss this action on the grounds that plaintiffs' claims are barred by the doctrine of collateral estoppel. They argue that the plaintiffs sought the administrative expunction of the indicated child abuse by omission report pursuant to state law, and to the extent that the appeal of that decision to the Commonwealth Court was unsuccessful, the administrative adjudication is subject to collateral estoppel. Collateral estoppel, otherwise known as issue preclusion, bars re-litigation of an issue identical to that in a prior action. See Bradley v. Pittsburgh Bd. of Educ., 913

F.2d 1064, 1070 (3d Cir. 1990). Preclusion in federal litigation following a judgment in state court depends on the Full Faith and Credit Statute, 28 U.S.C. § 1738, which requires the federal court to give the judgment the same effect as the rendering state would. "When the state judgment would not preclude litigation in state court of an issue that turns out to be important to a federal case, the federal court may proceed; otherwise not." Parkview Associates Partnership v. City of Lebanon, 225 F.3d 321, 329 (3d Cir. 2000), citing GASH Assocs. v. Village of Rosemont, 995 F.2d 726, 728 (7th Cir. 1993). We will decline to apply the doctrine of collateral estoppel or issue preclusion in this instance, as the issues presently before us are not identical to those before the state court.

## 2. State Actors

Plaintiffs allege violations of 42 U.S.C. § 1983 ("section 1983") in Counts I and V. In pertinent part, section 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws shall be liable to the party injured ...

42 U.S.C. § 1983. A plaintiff in a section 1983 action bears the threshold burden of proving that "the alleged deprivation was committed by a person acting under color of state law." Mark v. Borough of Hatboro, 51 F.3d 1137, 1141 (3d Cir. 1995). ECOCY admits that it's a state actor. Brief in Support of ECOCY Defendants Motion to Dismiss Pursuant to 12(b)(6) (Doc. 35) at 8. However, defendants Bethesda, Harborcreek and Kleiner argue that the plaintiffs have failed to set forth sufficient facts to demonstrate that they were "state actors" within the meaning of 42 U.S.C. § 1983.

Making the state action determination is a "necessarily fact bound inquiry." McKeesport Hospital v. The Accreditation Council for Graduate Medical Education (ACGME), 24 F.3d 519, 523 (3d Cir. 1994). "The traditional definition of acting under color of state law requires that the defendant in a section 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Abraham v. Raso,

13

183 F.3d 279, 287 (3d Cir. 1999). When none of the defendants were an officer or employee of the state, we must determine whether their actions are "fairly attributable to the state." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).

The Supreme Court has developed three tests to be used to determine the existence of "state action" in the context of the Fourteenth Amendment actions when the actor committing the acts cannot be fairly described as a state actor: (1) the "symbiotic relationship," "nexus," or "joint participation" test; (2) the "public function" test; and (3) the "state compulsion" test. Lugar, 457 U.S. at 939.

Under the first test, state action may be found if the private party has acted with the help of or in concert with state officials. Compare Edmonson v. Leesville Concrete Co., 500 U.S. 614 (1991), Lugar, supra, and Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970) (finding state action) with Flagg Bros., Inc. v. Brooks, 436 U.S. 149 (1978) (finding no state action). In Edmonson, the Supreme Court set forth a two-prong test for determining whether state action may be predicated upon a theory of joint participation: we "shall ask [f]irst whether the claimed constitutional deprivation resulted from the exercise of a right or a privilege having its source in state authority; and second, whether the private party charged with the deprivation could be described in all fairness as a state actor." Edmonson, 500 U.S. at 620. State action may be found if "there is a sufficiently close nexus between the state and the challenged action of the [private] entity so that the action of the latter may fairly be treated as that of the State itself." Jackson v. Metropolitan Edison Co., 419 U.S. 345, 351 (1974).

Under the "public function" (or "exclusiveness") test, it is not enough to establish state action with proof demonstrating a private actor is performing a public function; it must be proven that the function performed is "traditionally the exclusive prerogative of the State." Rendell-Baker, 457 U.S. at 842. It may be found when the private party has been "delegated ... a power 'traditionally exclusively reserved to the State.' " Flagg Bros., 436 U.S. at 157, quoting Jackson, 419 U.S. at 352.

Under the "state compulsion" (or "acted in concert") test, state action is present if the state

14

compels an intermediary to, in essence, do the state's bidding. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). "A state normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." Blum v. Yaretsky, 457 U.S. 991, 1004 (1982).

The plaintiffs appear to allege that Bethesda and Harborcreek are "state actors" under all three of these tests. Bethesda argues that it is a private, non-profit organization and is not an arm or agent of the government. Bethesda and Harborcreek are both licensed by the Pennsylvania Department of Public Welfare and have a contractual relationship with the ECOCY; they argue that the mere existence of a contractual or funding relationship between a private, non-profit entity and a state agency, or even regulation by a state agency, is insufficient to support a claim of state action, absent more.

We first turn to the second test described supra, the "public function test." In Rendell-Baker v. Kohn, the Court held that a non-profit, private school for troubled teenagers, which received "virtually all" of its income from government funding, was regulated and had contracts with several governmental agencies, had not acted under color of law. "Acts of such private contractors do not become acts of the government by reason of their significant or even total engagement in performing public contracts." Id. at 840-41. It is clear from Rendell-Baker that a state contractor and its employees are not state actors simply because they are carrying out a state sponsored program and the contractor is being compensated therefore by the state. For the nature of the contractor's activity to make a difference, the function performed must have been "traditionally the exclusive prerogative of the State." 457 U.S. at 842; McKeesport Hospital v. ACGME, 24 F.3d 519 (3d Cir. 1994).

According to plaintiff, Bethesda is a private facility that matches foster children with foster homes and provides care to children upon its premises; courts have held that these functions are not the exclusive prerogative of the state but have historically been the responsibility of charities and religious organizations. Leshko v. Servis, et al., – F.3d – 2005 WL 2174051 (3d Cir. September 9,

15

2005); Rayburn v. Hogue, 241 F.3d 1341, 1347 (11th Cir. 2001). In Leshko, the United States Court of Appeals for the Third Circuit held that foster parents are not state actors for purposes of liability under 42 U.S.C. §1983. Plaintiff Leshko had been severely injured by her foster mother when Leshko was two years old and later, as an adult, sued the Dauphin County Social Services for Children and Youth, Dauphin County and various county officials under § 1983 for deprivation of her Fourteenth Amendment right to be free from physical harm, and under state negligence and constitutional theories. She also sued the Servises (her foster parents), alleging liability under § 1983 and state tort law. Leshko appealed the district court's dismissal of her § 1983 claim against the Servises, inasmuch as the district court held that the Servises were not state actors. The court noted that "while *removing children from their homes and placing them with other caregivers* arguably are exclusively governmental functions in Pennsylvania, the hands- on care may be tendered by families, private organizations, or public agencies, and thus is not exclusively governmental. Id. at 14-15. Thus, to the extent that plaintiffs allege that certain defendants were state actors when they placed J.O. in their home, such defendants contracted with the ECOCY and are state actors under the public function test.

As to the whether there was a "symbiotic relationship" with the state, such that the defendants' actions were in reality the state's actions, Rendell-Baker held that because "the school's fiscal relationship with the State [was] not different from that of many contractors performing services for the government," the school's actions were not state actions under this theory. 457 U.S. at 843. See Robert S v. Stetson School, Inc., 256 F.3d 159 (3d Cir. 2001). The defendants correctly argue that there has been no allegation that the fiscal well-being of Bethesda (and/or Harborcreek) and a government agency are dependent on one another or that there is a fiscal relationship that is any different from that of any other contractor.   We therefore reject the argument that there is a "symbiotic relationship" with the state so as to render the defendants "state actors" within the meaning of § 1983.

The plaintiffs also argue that the state's participation in the particular conduct complained of makes the Bethesda Defendants liable as state actors. Plaintiffs allege that an employee of the DPW

16

and one of Bethesda's employees communicated and that each entity separately notified the Bryans that their home was closed as a foster resource. This could give rise to an inference that the state directed the decision or that there was a conspiracy to deprive the Bryans of their constitutional rights.

We find that the plaintiff's allegations that the alleged deprivation was committed by a person acting under color of state law are sufficient at this early juncture of the case. We are mindful of our duty under the rules to accept as true all allegations in the complaint and all reasonable inferences that can be drawn from them after construing them in the light most favorable to the non-movant. Weston v. Pennsylvania, 251 F.3d at 425. Plaintiffs have pled that ECOCY contracted with Harborcreek to provide residential and foster care services to ECOCY, and that ECOCY contracted with Bethesda to provide foster care services. Complaint ¶ 10, 23. Defendant Kleiner is a therapist employed by Harborcreek; Kleiner is being sued individually and in her capacity as an employee of Harborcreek. Complaint ¶ 24. Plaintiffs have alleged that J.O. had been placed at Harborcreek by ECOCY prior to his placement with the Bryans, Complaint ¶ 22, and that J.O. was placed at Harborcreek when he began overnight and weekend visits with the Bryans in December, 2000, and when his placement was changed to foster care with the Bryans on March 30, 2001. Complaint ¶¶ 34, 39, 40. As explained earlier, the determination of whether there has been state action is necessarily a fact-bound inquiry and thus, we may examine these issues after full discovery and at the summary judgment phase, if necessary.

As noted above, a state normally can be held responsible for a private decision only when it has exercised coercive power or has provided such significant encouragement, either over or covert, that the choice must in law be deemed to be that of the State. Blum, 457 U.S. at 1004-05. The plaintiffs have alleged facts that, if proven true, could infer coercion or interdependence between the DPW and Bethesda or Harborcreek. Plaintiffs similarly aver that Bethesda and Mallory acted in concert with DPW state officials in licensing foster homes and in placing and removing children on those homes. Furthermore, plaintiffs allege communications between Bethesda and DPW and that Bethesda made the decision to remove R.S. and T.S. from the Bryan's home. Complaint ¶ 97.

17

Plaintiffs also allege that ECOCY and Bethesda together notified them that their home was closed as a foster care resource, pending the investigation into the first Childline. Complaint ¶ 109. Under these alleged circumstances, we find that the particular defendants can be considered state actors for purposes of meeting a threshold requirement under a motion to dismiss pursuant to Fed. R. Civ. P. 12(b).

### 3. Respondeat Superior

As to Count I, defendant Harborcreek also argues that there is no respondeat superior liability under section § 1983. In Monell v. Department of Social Services, 436 U.S. 658, 691 (1958), the Supreme Court of the United States held that local governmental agencies such as CYS may not be held liable under section 1983 solely on a theory of respondeat superior. Rather, liability must be premised upon a showing that the constitutional injury resulted from the implementation or execution of the agency's official policies, practices or customs. Id. at 694, 707-08. Liability cannot attach under section 1983 on a theory of respondeat superior or vicarious liability, but must be founded on an "affirmative link" between the violation alleged and an act or decision fairly attributable to the policy-making employee. Pembaur v. Cincinnati, 475 U.S. 469 (1986); Oklahoma City v. Tuttle, 471 U.S. 808, 823-24.

Harborcreek argues that plaintiffs have failed to allege that their purported injuries were the result of a custom, practice or policy on the part of Harborcreek. See Monell, 436 U.S. 707-708. Harborcreek argues that the plaintiffs have not alleged that Harborcreek has, in the past, been put on notice of similar incidents and failed to take reasonable corrective actions. Harborcreek further argues that the plaintiffs must allege that their injury is the result of an actual official policy of Harborcreek or that it was the result of a practice that was so widespread and so accepted so as to have the effect of an official policy citing City of Oklahoma City v. Tuttle, 471 U.S. 808, 823-24 (1985) (occurrence of single incident or unconstitutional activity is not sufficient to establish municipal or organizational liability under § 1983). In fact, Harborcreek argues, plaintiffs have alleged that Harborcreek failed to act in accordance with its own internal policies, Complaint at ¶¶ 69-70, which Harborcreek characterizes as a direct contradiction with a claim that the injury alleged

18

was caused by a custom, practice or policy.

Under Federal Rule of Civil Procedure 15(a), leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The decision whether to grant or deny a motion for leave to amend is within the sound discretion of the district court." Freedom Intern'l Trucks, Inc. of NJ v. Eagle Enters., Inc., 182 F.R.D. 172, 174 (E.D.Pa.1998) (citations omitted). "Among the grounds that could justify a denial of leave to amend are undue delay, bad faith, dilatory motive, prejudice, and futility." In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1434 (3d Cir.1997) (citations omitted). Futility is a challenge to the amendment's legal sufficiency. Freedom, 182 F.R.D. at 175. "'Futility' means that the complaint, as amended, would fail to state a claim upon which relief could be granted." In re Burlington Coat Factory, 114 F.3d at 1434 (citations omitted). In assessing futility, the Court 'applies the same standard of legal sufficiency as applies under Rule 12(b)(6).' " Freedom, 182 F.R.D. at 175. "Thus, in deciding whether an amendment is futile, a court must take all well pleaded facts in the complaint as true and view them in the light most favorable to the plaintiff." Id. (citing In re Burlington Coat Factory, 114 F.3d at 1434). Similarly, leave to file an amendment should be denied if 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." ' Id. (citation omitted).

We find that the plaintiffs have not sufficiently alleged that their injuries were the result of a custom, practice or policy on the part of Harborcreek, or that the injuries were the result of a practice that was so widespread and so accepted so as to have the effect of an official policy. To the extent that plaintiffs' Complaint is deficient as to respondeat superior liability, we will not permit plaintiff to amend the complaint because to do so would cause undue delay in this already protracted disagreement. Moreover, such an amendment would be futile; no relief could be granted under any set of facts that could be proved consistent with the allegations. Plaintiffs have alleged that Harborcreek failed to act in accordance with its own internal policies; this allegation directly contradicts the proposed allegation that the injuries sustained were the result of an official custom, policy or practice. As is set forth more fully infra, plaintiffs allegations do not rise to the level of a deprivation of a constitutional right.

19

### 5. Constitutional deprivation

#### a. Count I

Count I alleges violations of plaintiffs civil rights under 42 U.S.C. § 1983 with respect to the placement of J.O. in the Bryans' home and seeks redress for the injuries caused by J.O. to the Bryans and to K.B. Complaint ¶¶ 74, 75. Defendants Harborcreek and Kleiner argue that the plaintiffs have failed to identify any cognizable constitutional deprivation of a liberty or property interest, or of any substantive or procedural due process rights. Defendant ECOYC argues that plaintiffs have not made out an actionable section 1983 claim because it had no obligation to protect plaintiffs from the actions of J.O., a private citizen, not employed by ECOYC. ECOYC cites to Nicini v. Morra, 212 F.3d 798, 807 (3d Cir. 2000), which held: "As a general proposition, a state's failure to protect an individual against private violence does not constitute a violation of due process."

ECOYC argues that the Fourteenth Amendment does not require a state or local government agency to protect its citizens from private violence or other mishaps not attributable to its employees, citing Deshaney v. Winnebago County Dept. of Social Services, 489 U.S. 189, 197 (1989). In DeShaney, the Supreme Court held that in general, the Due Process Clause does not impose a duty upon the state to protect citizens. In DeShaney, a boy (Joshua) and his mother brought suit against social workers and local officials after Joshua was beaten and permanently injured by his father, alleging that his Fourteenth Amendment due process rights were violated by the defendants' failure to remove him from his father's custody. Id. at 191. The defendants had suspected that Joshua was the victim of child abuse and even went so far as to obtain a court order placing Joshua in the temporary custody of a hospital. Id. at 192-93. However, the defendants ultimately returned Joshua to his father's custody, where Joshua was severely beaten. Id. at 193.

In denying plaintiffs' claim, the Supreme Court explained that the Due Process Clause generally confers no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the

20

individual. Id. at 196. The Court thus held that a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause. Id. at 197.

Plaintiffs argued that there was a special relationship between Joshua and the state because the state had taken some steps to protect Joshua from his father, and that as a result of this special relationship, the state acquired a duty to protect Joshua in a reasonably competent fashion. Id. at 197. The Court rejected this argument, concluding that while in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals, id. at 198, this is only the case when the State takes a person into its custody and holds him there against his will, id. at 199-200. The Court explained that Joshua was not injured while in state custody, but while in the custody of his father. Id. at 201. The Court further explained that the fact that the State once took temporary custody of Joshua does not alter the analysis, for when it returned him to his father's custody, it placed him in no worse position than that in which he would have been had it not acted at all; the State does not become the permanent guarantor of an individual's safety by having once offered him shelter. Id. Thus, the Court found that the plaintiffs had failed to establish a due process violation. Id. at 203.

The Due Process Clause does not impose an affirmative obligation on the state to protect its citizens; it "forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law," but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means." DeShaney, 489 U.S. at 195. It is only when the state takes custody of a citizen, thereby depriving him or her of his or her liberty, that it assumes an affirmative duty to protect him or her from harm  Id. at 199. "The affirmative duty to protect arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his on behalf. Id. at 200. We note that plaintiffs have not alleged that they were in the "custody" of the state at the time of this incident.

Plaintiffs assert that they have alleged such a claim based upon the "state-created danger" theory announced by the United States Court of Appeals for the Third Circuit in Kneipp v. Tedder,

21

95 F.3d 1199, 1201 (3d Cir. 1996).  In Kneipp, the Court held that "[l]iability can arise under section 1983 for acts committed by private citizens where the state creates the danger or risk of harm that led to the Plaintiff's injury." Id. at 1205-06; Brown v. Commw., Dept. of HEMS Training Institute, 318 F.3d 473 (3d Cir. 2003).  A constitutional violation can occur when state authority is affirmatively employed in a manner that injures a citizen or renders him "more vulnerable to injury from another source than he or she would have been in the absence of state intervention." Scheiber v. City of Philadelphia, 320 F.3d 409, 416 (3d Cir. 2003).  This "state-created danger doctrine" has four essential elements:

1) the harm ultimately caused was foreseeable and fairly direct;

2) a state actor acted with a degree of culpability that shocks the conscience;

3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions as opposed to a member of the public in general; and

4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. Bright v. Westmoreland County, et al., 05-2005 (3d Cir. April 4, 2006) at 11-12, citing, inter alia, Kneipp, 95 F. 3d at 1209, n. 22, Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 906, 913 (3d Cir. 1997).[3]

In describing the fourth element, the Third Circuit has emphasized that " '[l]iability under the state-created danger theory is predicated upon the states' affirmative acts which work to the plaintiffs' detriments in terms of exposure to danger.'" Bright v. Westmoreland County, 443 F.3d 276, 282 (3d Cir.2006) (quoting D.R. by L.R. v. Middle Bucks Area Vocational Technical Sch., 972 F.2d 1364, 1374 (3d Cir.1992) (en banc)).  The fourth element also includes a causation requirement:

---

[3] We find that the conduct alleged in both Counts I and V does not rise to the level of "shocking the conscience." Scheiber v. City of Philadelphia, 320 F.3d 409, 418 (3d Cir. 2003).

there must be "a direct causal relationship between the affirmative act of the state and plaintiff's harm." Kaucher v. County of Bucks, 455 F.3d 418 (3d Cir. 2006).

These two requirements – that the state take some affirmative action and that that action have a causal relationship with plaintiff's harm – are illustrated by the cases in which the Third Circuit has found that the fourth element has been established. In Kneipp, police officers stopped Joseph and Samantha Kneipp on the street for causing a disturbance. Id. at 1201. The couple was walking home from a tavern, and Samantha was extremely intoxicated, to the point that she smelled of urine and was at times unable to walk without Joseph's assistance. Id. The police officers talked to both individuals, and eventually allowed Joseph to go home to relieve a babysitter. Id. at 1201-02. After Joseph left, the police officers let Samantha leave unaccompanied, id. at 1202; she was later found unconscious at the bottom of an embankment, and ultimately suffered serious brain damage, id. at 1203. In reviewing Samantha's legal guardians' due process claim, the court concluded that the police officers, in separating Samantha from Joseph and then leaving Samantha to travel home alone, had "made Samantha more vulnerable to harm." Id. at 1209. The court explained:

> It is conceivable that, but for the intervention of the police, Joseph would have continued to escort his wife back to their apartment where she would have been safe. A jury could find that Samantha was in a worse position after the police intervened than she would have been if they had not done so. As a result of the affirmative acts of the police officers, the danger or risk of injury to Samantha was greatly increased.

Id.

In contrast we look to cases in which the courts have found no affirmative action or no causation. In Kaucher, a corrections officer and his wife alleged that they contracted a disease due to the prison affirmatively creating dangerous conditions and affirmatively misrepresenting dangers. 455 F.3d at 418. However, the United States Court of Appeals for the Third Circuit rejected these arguments, because "at base, both aspects of their claim allege failures to take actions sufficient to prevent the Kauchers' infections." Id. at 432. The court then reiterated that "failures to act cannot form the basis of a valid § 1983 claim." Id. at 433 n. 11. Further, while the prison did take an affirmative act in distributing a memorandum discussing (and perhaps understating) the degree of

23

infection in the prison, it did not constitute a due process violation because "the memorandum was not the 'but for cause' of the Kauchers' infections"; rather, "[t]here had always been cases of staph infections at the jail." Id. at 434.

Similarly, in Sanford v. Stiles, 456 F.3d 298 (3d Cir. 2006), the United States Court of Appeals for the Third Circuit also found that the fourth element had not been satisfied. In Sanford, the mother of Michael, a boy who had committed suicide, brought a state-created danger claim against the guidance counselor at Michael's school, alleging that her actions increased the risk that Michael would commit suicide. Id. at 302. The guidance counselor had met with Michael about two weeks before he committed suicide after being given a note in which Michael stated that the actions of his ex-girlfriend "almost made [him] want to go kill [him]self." Id. . After meeting with Michael, the guidance counselor was convinced that Michael was not at risk, and therefore took no further action.  The court rejected Sanford's attempt "to recharacterize Stiles ' failures as affirmative actions," and reiterated that "mere failure to protect an individual ⋯ does not violate the Due Process Clause." Id. at 312. See also Bright v. Westmoreland County, 443 F.3d 276, 284 (3d Cir.2006) (finding no liability under state-created danger theory because "there can be no liability in the absence of an affirmative exercise of state authority"); Morse v. Lower Merion Sch. Dist., 132 F.3d 902, 915-16 (3d Cir.1997) (fourth element not satisfied because the one arguably affirmative act of the defendants – leaving unlocked the back door to a school through which the plaintiff's attacker entered – lacked the necessary direct causal relationship to the harm that befell plaintiff).

In Bright, the plaintiffs were the parents of an 8 year-old girl who was murdered by an individual who had pled guilty to corrupting the morals of the plaintiffs' 12-year old daughter and was under court order to have no contact with the victim and no unsupervised contact with any minor. Bright, 443 F.3d at 278. After the individual was seen in a department store with the 12-year old victim, probation officers prepared a violation report and requested a hearing to revoke probation. Id. at 278-79. While the preparation of these reports and requests took place over a period of approximately three months, the father of the girls called one of the police officers who had previously dealt with the individual/abuser shortly after the incident at the department store occurred

24

and asked that the individual be arrested. Id. at 279. Although the officer indicated that immediate action would be taken, none was, and before the probation revocation hearing occurred, the individual shot and killed the 12-year old girl's younger sister, the 8 year-old. Id. The plaintiffs sued the probation and police officers, alleging that "the affirmative acts and/or deliberate failure to enforce . . . the court-ordered conditions of probation" constituted a state-created danger that resulted in the death of the murder victim, violating her substantive right to due process under the Fourteenth Amendment. Even though the plaintiff had alleged that one police officer had witnessed the confrontation at the department store, and another officer assured Bright that the soon-to-be murderer would be arrested (thus causing Bright not to take any defensive actions such as leaving the area with his family) – the court found that state-created danger liability could not be predicated on these facts. The court stressed that under this element of a state-created danger claim, liability is predicated upon *affirmative acts* which work to the plaintiffs' detriments in terms of exposure to danger. Bright, 443 F.3d at 282. The Bright court further noted that it is the misuse of state authority, rather than a failure to use it, that would violate the Due Process Clause. Id. "[T]he Due Process Clause did not require that Westmoreland County 'become the permanent guarantor' of the Bright family's safety from private violence any more than it required Winnebago County to 'become the permanent guarantor' of Joshua's safety from the same form of harm." Id. at 285, citing DeShaney, 489 U.S. at 201.

As in Sanford and Bright, the Bryans' allegations fail to meet the "affirmative actions" requirement because they all center on actions that the defendants did not take, rather than on affirmative actions which the defendants did take. Plaintiffs allege that defendants either did know or should have known of J.O.'s sexually abusive and violent behavior toward others and that J.O. posed a serious risk of harm to the minor children in the Bryans' home. Complaint ¶¶ 20,59. They further allege that the defendants and its employees should have either disclosed their actual knowledge of J.O.'s propensities, or should have investigated his history, warned the Bryans and provided a safety plan to them. Complaint ¶¶ 48-50, 60, 61. Plaintiffs allege that the defendants failed to meet their obligations to perform risk assessments of J.O., and that even if they had made

25

those assessments, they deliberately or recklessly disregarded or failed to disclose the information
set forth in those assessments. Complaint ¶¶ 56, 57. Plaintiffs further allege that the ECOCY
defendants engaged in a policy, practice and custom of failing to perform risk assessments with
respect to foster children in their custody and failing to advise or disclose the results of the risk
assessments to foster parents. Complaint ¶ 64. As in Sanford, the plaintiffs allegations in Count I
do not rise to the level of a constitutional violation under the state created danger theory because
"mere failure to protect an individual . . . does not violate the Due Process Clause." 456 F.3d at 312.
Moreover, plaintiffs have not alleged facts which could reasonably be interpreted to include an
affirmative act on the part of the defendants which created a foreseeable opportunity for harm; nor
have they alleged that there was a direct causal relationship between the defendants affirmative
actions and alleged harm that resulted. Morse, 132 F.3d at 915-16.

Defendant ECOCY argues that plaintiffs have also failed to state a §1983 claim under the so-
called "special relationship" theory, which "provides that liability can arise under § 1983 for acts
committed by private citizens only if the State entered into a special relationship with the plaintiff
under which it assumed a duty to ensure the plaintiff's continued well being." Robbins, 802 A.2d at
1248. Although the Robbins court found that a "special relationship" was created between the foster
child and the CYS when the CYS placed the child in foster care, 802 A.2d at 1249, the defendants in
the case herein argue that plaintiffs did not assert facts to show that a special relationship existed
between them and ECOYC, and even if they had, the state has not been alleged to have affirmatively
acted to restrain an individual's freedom to act on his or her behalf by some limit of personal liberty.
Kneipp at 1249. In D.R. by L.R. v. Middle Bucks Area Vocational Technical School, 972 F.2d
1364 (3d Cir. 1992), the court affirmed the dismissal of a §1983 action brought by two female
students who had been sexually assaulted by male students while on school grounds; it held that
there was no special relationship between school officials and their students despite the state's
compulsory school attendance laws and despite the *in loco parentis* authority of public school
officials. As explained DeShaney, it is only when the state takes a person into its custody and holds
them there against his will, that the Constitution imposes upon the state affirmative duties of care

26

and protection. 489 U.S. at 199-200. The plaintiffs were not so situated.

Defendant Barry Kohler has filed a "Motion to Dismiss pursuant to F.R.C.P. 12(b)(6) or, in the Alternative, Motion for Summary Judgment." (Doc. 25). In his brief in support, and through is affidavit, Mr. Kohler explains:

> Although in their Complaint, the Plaintiffs identify Defendant Barry Kohler as an individual contracted to the Erie County Office of Children and Youth and have named him individually and in his capacity as a contracted employee and agent of the Erie County Office of Children and Youth, Mr. Kohler was at all times relevant hereto an employee and agent of Case Management Support Services, Inc. . . . [which] provides services pursuant to a contract with Erie County Office of Mental Health and Mental Retardation. Pursuant to that contract, he works with an assigned caseworker from the [ECOCY], but is not an employee or agent of the [ECOCY].

Br. In Supp. of M. To Dismiss (Doc. 37) at 5-6. Plaintiffs admit that they did not realize who employed Kohler until plaintiffs received Kohler's motion to dismiss. Omnibus Br. of Pls. (Doc. 39) at Tab 6, p. 1. Even assuming that Kohler is a "state actor", we find that the plaintiffs have not adequately alleged any acts or omissions on the part of Defendant Barry Kohler which would support the claims for violations of their constitutional rights, or other tortious conduct. The Complaint only contains specific allegations against Mr. Kohler in paragraphs 85, 86 and 91; these allegations concern the reporting of the sexual abuse of K.B. by J.O. Plaintiffs do not allege that Mr. Kohler had any specific involvement with either the placement or removal of J.O. in their home, and they do not identify how Kohler's actions or inactions were within the chain of causation of their injuries. Plaintiffs allege that there was a four day delay in reporting the alleged abuse to Childline, but they fail to allege how this delay harmed them. There is no allegation in the Complaint sufficient to rise to the level of a fundamental right protected by substantive due process. See Rodriguez v. McLoughlin, 214 F.32d 328 (2d Cir. 2000) (any protected liberty in the preservation of a biologically unrelated foster family arises under state law, and not under the due process clause itself). Accepting as true all the allegations in the complaint and all reasonable inferences that can be drawn from them, after construing them in the light most favorable to the plaintiff, we find that plaintiff has failed to state a claim as to defendant Barry Kohler. We will therefore grant Mr. Kohler's motion to dismiss.

27

### b. Count V

In Count V plaintiffs allege a violation of their substantive due process rights of family integrity and economic security as a result of the removal of R.S. and T.S. from their home, and allege that they were harmed by the disruption of their family structure and the resulting impairment of Mrs. Bryan's opportunity for employment. Apparently plaintiffs believe that as a result of the Childline report being determined "indicated" rather than "unfounded," Mrs. Bryan can no longer find work as a nurse. Complaint ¶¶ 126-128.

The Bethesda defendants argue that the Bryans have not alleged any fundamental right protected by substantive due process, citing to Nicholas v. Pennsylvania State University, 227 F.3d 133, 139 (3d Cir. 2000), which held that a plaintiff must first allege that a "particular quality of property interest" has been deprived; this depends on whether the interest is "fundamental" under the United States Constitution. Such protected interests are generally limited to a narrow group including "matters relating to marriage, family, procreation, and the right to bodily integrity." Albright v. Oliver, 510 U.S. 266, 272 (1994). Bethesda argues that these rights do not include a due process right to preservation of a foster family, citing Rodriguez v. McLoughlin, 214 F.3d 328, 337 (2d Cir. 2000). In that case the United States Court of Appeals for the Second Circuit held that there is no due process interest in foster families because foster families are created through contractual arrangements. Bethesda argues that the Bryans do not state what interest they believe was violated other than the desire to be certified so that they could serve as foster parents, the desire to continue providing care to T.S. and R.S., and in not having Childline reports filed against them. Such interests are not "rights" or "entitlements" founded upon the United States Constitution but rather are interests which were granted contractually by the state, according to Bethesda. Similarly, the individual Commonwealth defendants also argue that the complaint fails to set forth a viable substantive due process claim against either Kazmer or Petulla because the plaintiffs have failed to identify any fundamental interest or right which Kazmer or Petulla may have violated.

We find that the plaintiffs have failed to state a claim for violation of their substantive due process rights because they have not identified any fundamental interest which these defendants

28

have violated. We must "determine whether the plaintiff has alleged a deprivation of a constitutional right at all." Nicini v. Morra, 212 F.3d 798, 806 (3d Cir. 2000). Due process under the Fourteenth Amendment protects the individual against arbitrary action of the government. Coleman v. State of New Jersey Division of Youth and Family Services, 246 F.Supp.2d 384, 388 (D.N.J. 2003). The Bryans have not and cannot assert that they had a fundamental right in being certified as a foster home, in having two foster children live in their home or being free from Childline reports. Protected interests are generally limited to a narrow group including "matters relating to marriage, family, procreation, and the right to bodily integrity." Albright v. Oliver, 510 U.S. 266, 272 (1994). The constitutional protection of parents' interest in the custody, care and management of their children is not absolute when allegations of child abuse are involved. Puricelli v. Houston, 2000 WL 760522 \*7 (E.D. Pa. 2000).     Where there is a reasonable suspicion of child abuse or that a child is in imminent danger, there is no arbitrary abuse of power. Puricelli at \*8.

In this case, the plaintiffs allege that their son had been sexually abused by their foster child, which was reasonable evidence that gave rise to a suspicion of child abuse; the plaintiffs therefore had no fundamental interest in being free from a child abuse investigation. The defendant Kazmer was an employee of the Department of Public Welfare Western Region Office of Children, Youth and Families (WROCYF); he allegedly signed and sent formal notice of the Childline abuse report to the Plaintiffs. Plaintiffs allege that Kazmer informed the judge investigating the case that he had evidence against the plaintiffs, although he knew that there was no credible evidence.    Plaintiffs claim that this behavior was intentional, reckless, and deliberately indifferent to the truth. Complaint ¶ 107. Plaintiffs further allege that Kazmer and another defendant's investigation of the Bryans was insufficient and therefore, an "arbitrary abuse of power" significant enough to violate their substantive due process rights. Coleman, 246 F.Supp.2d at 288. Moreover, Petulla is the Department of Public Welfare Director of Bureau of County Children and Youth Programs. Plaintiffs allege he had a conflict of interest because at the time J.O. was placed with the Bryans, he was the Director of the ECOCY. Complaint ¶ 122. In his position as Director of the Bureau, Petulla received a request from the plaintiffs to administratively expunge the "indicated" report of child

29

abuse, which, after a review, *he declined*, and instead, directed that plaintiffs' appeal be heard by an administrative law judge. Complaint ¶ 121.

We find that this behavior by Kazmer and Petulla was not an arbitrary abuse of power significant enough to violate plaintiff's substantive due process rights. The actions taken by these defendants in investigating the incident of abuse at the plaintiffs' home are not so "ill-conceived or malicious that is shocks the conscience." Miller, 174 F.3d at 375. Even under plaintiff's theory, there was an objectively reasonable suspicion of abuse which justified the degree of interference with the Bryans' rights.

The Bryans' claim against the Bethesda Defendants will be dismissed because the plaintiffs have not alleged actions that were arbitrary or capricious. Austin v. Neal, 933 F. Supp. 444, 455 (E.D. Pa. 1996). The filing of Childline reports and decertifying the Bryans' home were rationally related to the protection of foster children from any possible further abuse. Moreover, the removal of the pre-adoptive children R.S. and T.S. was due to the "indicated' Childline report, by plaintiff's own admission, Complaint ¶ 97, which in itself provides a reasonable basis to remove the children.

Defendant Elizabeth Mallory also argues that even if a state action is found, she is entitled to qualified immunity because she did not violate constitutional rights that are well established. We agree. Actors who perform discretionary functions are shielded from liability to the extent that their conduct does not establish statutory or constitutional rights of which a reasonable person would have known. Gruenke v. Seip, 225 F.3d 290, 299 (3d Cir. 2000); Wooley v. City of Baton Rouge, 211 F.3d 913 (5th Cir. 2000). Even if the Bryans have a constitutionally protected interest in being certified as foster parents, in not having foster children removed from their home or in not having Childline reports filed against them, those interests are not firmly established in law such that Ms. Mallory should be subject to civil liability.

Therefore, the fifth cause of action alleging a violation of the Bryans' substantive due process rights will be dismissed for failure to state a claim.

The individual Commonwealth defendants also assert that they are entitled to qualified immunity and defendant Petulla argues that he is entitled to absolute immunity for actions taken in

30

his adjudicatory capacity when he presided over administrative hearings.  Will v. Michigan Dept. of State Police, 491 U.S. 58, 71 (1985); Rodriguez v. Stevenson, 243 F.Supp.2d 58 (D. Del. 2002); Ernst v. Children and Youth Services, 108 F.3d 486, 495 (3d Cir. 1997).

To the extent that plaintiffs are suing Petulla in his official capacity as former Executive Director of ECOCY and Director of the Bureau of County Children and Youth Programs at the Department of Public Welfare, he is entitled to absolute immunity for his actions.  Kentucky v. Graham, 473 U.S. 159, 166 (1985); Mt. Healthy Board of Education v. Doyle, 429 U.S. 274, 280 (1977); Radeschi v. Pennsylvania, 846 F. Supp. 416 (W.D. Pa. 1993).  A judge is immune from liability when the judge has jurisdiction over the subject matter and is performing a judicial act. Stump v. Sparkman, 435 U.S. 349 356 (1978).  "The Supreme Court has recognized that judges are immune from suit under section 1983 for monetary damages arising from their judicial acts." Mireles v. Waco, 502 U.S. 9 (1991).  A judge will not be deprived of immunity even if the action taken was in error, was done maliciously, or was in excess of his authority.  Stump, 435 U.S. at 356-57.

Judicial immunity is overcome only where the acts complained of were not official actions taken in the judge's official capacity, or where the acts, although judicial in nature, were performed in the complete absence of all jurisdiction.  Mireles, 502 U.S. at 11-12.  Whether an act is a "judicial act" depends upon whether it is a function normally performed by the judge, and whether the party dealt with the judge in his or her official capacity.  Stump, 435 U.S. 349.

We find that defendant Petulla's actions taken in regard to his role of receiving plaintiffs' appeal and presiding over administrative hearings that affirmed the Department's finding of abuse by omission entitles him to absolutely immunity.  Ernst, 108 F.3d at 495.  We will therefore dismiss him from this action.

## B. State Law Claims

Counts II through IV and VI through VIII allege state law claims.  According to Section 1367(c)(3) of Title 28, we may decline to exercise supplemental jurisdiction over a claim if we have dismissed all claims over which we have original jurisdiction.  28 U.S.C. § 1367(c)(3) (2000).  In

exercising our discretion to accept or decline supplemental jurisdiction over a claim, we should take into account generally accepted principles of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so. Borough of West Mifflin v. Lancaster, 45 F.3d 780, 788 (3d Cir. 1995). Moreover, the commentary notes that "in this category, judicial discretion is a particularly important element." David D. Siegel, Practice Commentary, appended to 28 U.S.C. § 1367 (1993).

We believe that we must proceed to exercise jurisdiction over the other state claims because the law encourages us to decide governmental immunity issues early in the proceedings and because judicial economy mandates that this case be resolved expeditiously. Saucier v. Katz, 533 U.S. 194, 200 (2001). Although this case has only proceeded to the beginning phase of the filing of motions to dismiss (and thus, we have not heard any evidence necessary to reach a decision on the plaintiff's state law claims), our decision has been unfortunately delayed by our expectations that we would receive guidance from the United States Court of Appeals for the Third Circuit in the area of "state created danger" jurisprudence, discussed supra. This guidance came about in the spring and summer of 2006. Fairness to the parties mandates that where state law claims are clearly frivolous or insufficient, they should be dismissed at the earliest possible juncture. Therefore, we will exercise supplemental jurisdiction over certain state law claims, as is more fully set forth below, where such claims are clearly without merit, or where plaintiffs concede they have no cause of action.

### 1. Recovery of Punitive Damages

Harborcreek argues that to the extent that plaintiffs contend that Harborcreek is a municipal entity, any and all claims against it for punitive damages are barred. Likewise, ECOCY argues that it is a local government agency and therefore may not have punitive damages assessed against it. Under Pennsylvania law, punitive damages are not recoverable against an agency or against individual defendants sued in their official capacities. Robbins v. Cumberland County Children and Youth Services, 802 A.2d 1239, 1253 (Pa. Cmwlth. 2002). Plaintiffs concede this point, and we will therefore strike the plaintiffs' demand for recovery of punitive damages as to these entities and individuals acting in their official capacities.

32

We will decline to exercise jurisdiction over the claim for punitive damages against the individual ECOCY defendants and the individual Harborcreek defendants.

## 2. Immunity Under PSTCA

Defendant ECOCY argues that it enjoys immunity as a local agency pursuant to the Pennsylvania Political Sub-Division Tort Claims Act ("PPSTCA"), citing 42 Pa. C.S.A. § 8541 et seq. and Robbins v. CCCYS, 802 A.2d 1239, 1252 (Pa. Commw. 2002). The PPSTCA succinctly and clearly provides that "no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency of an employee thereof or any other purpose." 42 Pa. Cons. Stat. Ann. § 8541. ECOCY argues that all of the tort claims, namely Counts II, III, IV, VI, VII and VIII should therefore be dismissed on ground of immunity. Plaintiffs concede that ECOCY itself, as a local agency, is immune from suit, pursuant to 42 Pa. C.S. § 8550. Omnibus Br. of Pls. (Doc. 39) at Tab 3, p. 7. Therefore, we will enter an appropriate order dismissing ECOCY from each of these counts sounding in tort.

While the Bryans concede that ECOCY in its capacity as a local agency would be immune from liability for actions sounding in tort, they contend that the conduct of the individual employees constituted willful misconduct serving to vitiate their immunity. The PSTCA provides:

> In any action against a local agency or employee thereof for damage on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, *actual malice or wilful misconduct*, the provisions of Section 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

42 Pa. C.S. § 8550 (emphasis added). ECOYC argues that its employees are also immune from the intentional torts alleged in this case– intentional infliction of emotional distress, assault and battery, defamation, and conspiracy – because their alleged conduct does not rise to the level of "willful misconduct." The ECOCY Defendants rely on Robbins v. CCCYS, 802 A.2d 1239, 1252 (Pa. Commw. 2002). In Robbins, a minor child and his adoptive parents sued Cumberland County Children and Youth Services and several individually named directors, administrators and

33

caseworkers for failure to protect the child from physical abuse inflicted by his natural mother prior to his placement with them. The Robbins alleged that CYS and several of its employees failed to investigate properly allegations of child abuse. They alleged negligence and intentional infliction of emotional distress. The Robbins court, citing its holding in King v. Breach, 540 A.2d 976, 981 (Pa. Cmwlth. 1988), described the type of behavior which constitutes willful misconduct as follows:

> Willful misconduct, for the purposes of tort law, has been defined by our Supreme Court to mean conduct whereby the actor desired to bring about the result that followed, or at least it was substantially certain to follow, so that such desire can be implied. In other words, the term 'willful misconduct' is synonymous with the term 'intentional tort.'

802 A.2d at 1252-53 (citations omitted). The ECOYC Defendants argue that the plaintiffs have not alleged facts that support a claim that any of the individually named ECOYC employees acted with the specific intent to harm any of the plaintiffs. Plaintiffs argue that willful misconduct or intentional conduct has been alleged, noting the following allegations in the complaint:

● ¶¶ 51-55 allege the "involvement" of the defendants Petulla, Cancilla, Baxter, Skalco and Lewis;

●¶ 55 alleges that Cancilla, Baxter, Merrit and Sullivan reviewed and approved all placements of foster children;

●¶¶ 60-62 allege that the ECOCY Defendants never disclosed or advised plaintiffs concerning J.O.'s sexually abusive or violent behavior or the danger he posed to the Bryans and failed to warn the Bryans of this;

●¶ 69 alleges the ECOCY Defendants (and Harborcreek Defendants) acted recklessly and with deliberate indifference in failing to perform their duties of assessing risks of placing J.O. in plaintiffs' home of disclosing information about J.O.'s propensities for sexually abusive and violent behaviors and of keeping J.O. from being placed in the plaintiffs' home where the risks of harm to plaintiffs' minor children were known and ignored;

●¶ 71 alleges that as a result of this "reckless and deliberately indifferent conduct" . . . these Defendants did create and place the Plaintiffs in danger and subject the minor and parent Plaintiffs to serious harm and injury; and

●¶¶ 72 and 73  allege the acts/omissions were "outrageous, intentional, reckless and negligent."

When the allegations in the plaintiffs' complaint are examined, and the reasonable inferences that can be drawn therefrom are made, we find that the complaint does not adequately allege willful misconduct or that the defendants acted with a desire to bring about the result that followed, or at least was substantially certain to follow.  The facts and holding in Robbins  compel our decision.  The abused children in Robbins had been treated at the emergency room several times for fractures and the CYS had performed cursory investigations after repeated incidents of abuse; one sibling ultimately died after his mother suffocated him.  The court affirmed the trial court's order sustaining the preliminary objections on the grounds that the individual CYS employees were immune from suit because the allegations did not state a claim that any of the individual employees acted with the specific intent to injure plaintiffs.  Id. at 1253.     There, the court noted that the trial court had stated the following:

[A] fair reading of the factual allegations regarding the Defendants' conduct, and the reasonable inferences to be drawn therefrom if believed, do not support a conclusion that any of the individual defendants acted with malignant feelings or a wicked disregard of the interests of the minor plaintiff.  Nor do they support a conclusion that any such defendant acted with an intent that the minor plaintiff be injured, or with an awareness that his injuries were substantially certain to occur.  At most, the complaint presents a series of events in which an error of judgment by a defendant in failing to recognize an unusual. . . disorder. . . resulted in the most tragic of consequences.

Robbins, 802 A.2d at 1253, citing Diaz v. Houck, 632 A. 2d 1081, 1085 (Pa. Comm. 1993).  In the case at bar, the plaintiff has not clearly alleged that the acts of the employee caused the injury and that such acts constituted a crime, actual fraud, actual malice or willful misconduct.  Plaintiffs have alleged a serious error in judgment and negligence, rather than a specific intent to harm.  We will therefore grant the individual ECOCY employees' motion to dismiss on the grounds that they enjoy immunity from these tort claims.

### 3. Counts II and VI–Intentional Infliction of Emotional Distress

Counts II and VI allege intentional infliction of emotional distress.  Complaint ¶¶ 76, 77, 129.  Under Pennsylvania law, maintenance of a claim of intentional infliction of emotional

35

distress requires a showing of the following four elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe. Chuy v. Philadelphia Eagles Football Club, 595 F.2d 1265, 1273 (3d Cir.1979); Kazatsky v. King David Memorial Park, 527 A.2d 988, 991 (Pa. 1987).

The Bethesda Defendants argue that the conduct alleged at Count VI, even if true, does not rise to the high standard of outrageousness that is required to properly allege a claim for intentional infliction of emotional distress. In addition they argue that plaintiffs have failed to adequately plead a specific medical injury, a required element for the tort of intentional infliction of emotional distress.

Defendants Harborcreek and Kleiner argue that as to Count II (First Factual Background) plaintiffs Paul and Bonnie Bryan have failed to allege that they suffered any medically verifiable injury as a result of the alleged conduct. The law requires "competent medical evidence of causation and severity." Williams v. Guzzardi, 875 F.2d 46, 52 (3d Cir.1989). To state a claim for intentional infliction of emotional distress, the plaintiff must allege physical injury. Rolla v. Westmoreland Health System, 651 A.2d 160, 163 (Pa.Super.1994), quoting Hart v. O'Malley, 436 Pa.Super. 174, 647 A.2d at 553).See also Stouch v. Brothers of Order, 836 F. Supp. 1134, 1145 (E.D. Pa. 1993); Malia v. RCA Corporation, 690 F.Supp. 334, 336 (M.D.Pa.1988); Rittenhouse Regency Affiliates v. Passen, 482 A.2d 1042, 1043 (Pa. Super. 1984), citing, inter alia, Martin v. Little, Brown & Co., 450 A.2d 984, 988 (Pa. Super. 1981); Restatement (Second) of Torts § 46, cmt. d. Plaintiffs have acknowledged that neither Paul nor Bonnie Bryan have stated a claim against Harborcreek for intentional emotional distress, Pls.' Br. at tab 4, p. 11, and therefore we will grant the motion to dismiss Count II as to defendants Harborcreek and Kleiner.

In order to recover damages for distress caused by the wrongful conduct directed at a third person, the plaintiff must be "present at the time" of the conduct. Taylor v. Albert Einstein Medical Center, 754 A.2d 650, 652 (Pa. 2000). In Taylor, the plaintiff failed in her attempt to recover under this theory because she was not physically present in the room when her daughter died as a result of a faulty medical procedure. Id. The "presence" requirement of Section 46(2) corresponds to an

36

element required in the context of claims for negligent infliction of emotional distress, where the "critical element for establishing such liability is the contemporaneous observation of the injury to the close relative." Mazzagatti v. Everingham, 516 A.2d 672, 679 (Pa. 1986). Where one is not present at the scene of tortious conduct, but instead learns of it later from a third party, he is buffered against the full impact that presence and observation would have entailed. Id. at 679. "By contrast, the relative who contemporaneously observes the tortious conduct has no time span in which to brace his or her emotional system." Id.

Thus, we find that --in addition to our finding that ECOCY and its employees enjoy immunity pursuant to the PSTCA-- the plaintiffs Bonnie and Paul Bryan have no claim for intentional infliction of emotional distress at Count II against ECOCY and the ECOCY defendants, because these plaintiffs were not physically present when the injury occurred. This would not be the case as to plaintiff parents' claim on behalf of their son, K.B.

We will decline to exercise jurisdiction over the remaining claims of intentional infliction of emotional distress. These claims are at the earliest stages after remand, and there would be no waste of judicial resources to remand the case at this point to state court. Remand at this juncture provides a clean break that would allow a state court to resolve a discrete claim under Pennsylvania law. In Motheral v. Burkhart, 583 A.2d 1180 (Pa.Super.1990), the court stated that in order to recover on a claim for intentional infliction of emotional distress, the conduct complained of must be so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly intolerable in a civilized community." The precise meanings of these terms under Pennsylvania law appear to be unclear and are best determined by a state court. See Gibbs v. Ernst, 615 A.2d 851, 856 (Pa. Cmwlth. 1992), rev'd, in part, on other grounds, 647 A.2d 882 (Pa. 1994); Hackney v. Woodring, 622 A.2d 286, 289 (Pa. Super. 1993).

Therefore, as to any remaining allegations in Counts II and VI, we decline to exercise jurisdiction over such claims in the interest of judicial economy, convenience and fairness to the parties. Plaintiffs have already sought to litigate their state claims in state acourt, and principles of basic fairness suggest that they be allowed to do so when such claims are not clearly frivolous or

37

lacking in merit.

### 4. Count III–Negligence per se

Count III alleges negligence per se against ECOCY, Harborcreek, and Kleiner. Defendants Harborcreek and Kleiner[4] argue that plaintiffs have failed to allege conduct that if true, would violate 55 Pa. Code §3700.38 (c) or (d), or 55 Pa. Code 3160.67. Plaintiff responds that this regulation was incorrectly noted in the Complaint and should have read Section 3130.67(a), (b)(2)(vi) and (viii), (3) or (7). Omnibus brief at tab 4, p. 12. According to plaintiffs, these defendants' failure to provide information on J.O.'s history of sexual conduct and/or violent behavior, in violation of the above-cited state regulations, constitutes negligence per se. A claim of negligence per se arises out of a violation of a statute or regulation that establishes a duty. Taylor v. Danek Medical, Inc., 1998 WL 962062 (E.D. Pa. 1998). Under Pennsylvania law, negligence per se consists of four elements: (1) the purpose of the statute must be, at least in part, to protect the interest of the plaintiff individually, as opposed to the public; (2) the statute or regulation must clearly apply to the conduct of the defendant; (3) the defendant must violate the statute or regulation; and (4) the violation of the statute must proximately cause the plaintiff's injuries. Jordan v. City of Philadelphia, 66 F. Supp. 2d 638, 644 (E.D. Pa. 1999). Again, we decline to exercise jurisdiction over this state law claim out of consideration for fairness, judicial economy and , and convenience to the parties. Such matters are better left in the hands of the state courts, especially when a claim such as this is at the early stage of litigation.

### 5. Count IV–Assault and Battery

In Count IV, K.B. alleges assault and battery; he seeks damages resulting from his physical, emotional, and psychological injuries. The plaintiffs argue that by causing the placement of a known "sexual predator" in the Bryan home, the Harborcreek defendants should be held liable for assault and battery.

In order to establish a prima facie case for assault, a plaintiff must allege that the defendant

---

[4] We have previously held that ECOCY is immune from this action sounding in tort.

38

acted "intending to cause imminent apprehension of a harmful or offensive bodily contact."
Restatement (Second) of Torts § 21 (4th ed.1989). To state a claim for battery, a plaintiff must
allege that the defendant acted "intending to cause a harmful or offensive contact or an imminent
apprehension of such contact and [an] offensive contact result[ed]." Restatements (Second) of Torts
§ 18 (4th ed.1989); see also Herr v. Booten, 580 A.2d 1115, 1117 (Pa. Super.1990) (dismissing
plaintiff's claim for battery when no harmful or offensive contact occurred).

Defendants Harborcreek and Kleiner argue that plaintiffs have failed to allege any action on
the part of them that was intended to, or in fact did, cause an imminent apprehension of harmful or
offensive bodily conduct or any actual harmful or offensive contact by Harborcreek or Kleiner. We
note that defendants who behave by common design or mutual aid in bringing about an injury to a
plaintiff may all be liable for assault and battery even if only one defendant actually struck the
plaintiff. Ricker v. Weston, 2000 WL 1728506 (E.D. Pa. 2000). However, we find that the assault
and battery allegations against Harborcreek and Kleiner cannot survive the defendants' motion to
dismiss. There is no allegation that these entities through their employees were present in the Bryan
home at the time of the actual physical contact or threatened physical contact, nor that they
personally had any direct involvement with this incident, such that they condoned or encouraged or
intended to participate in acts that lead to the plaintiff's injuries. As such, the claims for assault and
battery must fail. DiJoseph v. City of Philadelphia, 947 F. Supp. 834, 844 (E.D. Pa. 1996) (assault
and battery claims dismissed in the absence of touching or threatening plaintiff with physical
contact). Accordingly, Plaintiff's claims in Count IV for assault and battery will be dismissed for
failure to state a claim upon which relief can be granted.

### 6. COUNT VII–defamation

Count VII allege defamation against the defendants for conduct described in the "Second
Factual Background" – the filing of allegedly false and unfounded Childline reports against the
Bryans. The Bethesda Defendants argue that the statute of limitations for defamation – one year–
has expired and therefore the Bryans are barred from pursuing this claim. The statute of limitations
for defamation is one year in Pennsylvania. 42 Pa. C.S.A. § 5523(1). The Complaint was filed on

39

August 12, 2003; according to the Complaint, the initial Childline report (alleging the Bryans were abusers by omission) was made on October 22, 2001 and the Bryans' certification was revoked on December 11, 2001. Plaintiffs concede that as to Bethesda, their claims are barred by the statute of limitations, "Brief of Plaintiffs in Opposition to Motion to Dismiss Filed on Behalf of Defendants, Bethesda Children's Home and Elizabeth Mallory" (Doc. 39, Tab 8) at 15. Therefore, COUNT VII will be dismissed as to the Bethesda Defendants.

We have reviewed the allegations in ¶¶ 83 through 126 of the Complaint ("Second Factual Background") and ¶¶ 130 through 132 (defamation); none of the alleged defamatory remarks occurred within a year of the initiation of this action. We therefore hold that any and all defamatory communications or publications alleged against the remaining defendants[5] are time-barred and therefore, Count VII will be dismissed in its entirety.

### 7. COUNT VII–conspiracy

Paragraphs 133 and 134 of the Complaint allege that the defendants acted in concert to cause the Plaintiff parents the severe emotional distress, harm to character and reputation. Complaint ¶ 133, 134. According to the plaintiffs, the defendants engaged in a conspiracy to cover-up their own mistakes in placing J.O. with the Bryans by filing false Childline reports:

> At all times set forth in Paragraphs 83 through 123 above, the actions of the Bethesda, ECOCY, WROCYF and DPW Defendants were undertaken deliberately and/or recklessly for purposes of discrediting and harming the Plaintiffs, making the Plaintiffs appear to be unfit foster parents, and to conceal the failures of the respective Defendants with respect to the placement of J.O. with Plaintiffs.

Complaint ¶ 125. Plaintiffs also argue that they have adequately alleged the information regarding the true threat J.O. would pose in a family of minor children was not disclosed to the Plaintiffs, that

---

[5] Although ECOCY has been dismissed on other grounds, we note that the defamation claims against the ECOCY should be dismissed as in Jones v. Snyder, 714 A.2d 453 (Pa. Super. 1998), because the defendants acted within their duty to report possible child abuse cases to Childline. Although we hold that the defamation claim is time-barred, we also find that when the behavior of the ECOCY and its employees is judged against an objective standard, their conduct would be protected by the good faith presumption of the Child Protective Services Law. 23 Pa. C.S.A.. §§ 6318 (a), (b); Jones, 714 A.2d at 457.

the lack of disclosure caused the abuse J.O. incurred upon K.B., and that the various defendants undertook these actions in order to cover up their own failures in the placement process. Pls.' Br. at tab 3, p. 24.

The Bethesda Defendants argue that insofar as the underlying torts of defamation and intentional infliction of emotional distress fail, so too must the conspiracy. Moreover, they argue that the Bryans have not alleged a combination or agreement of Bethesda with another entity to harm the Bryans, which is an essential element to state a claim for civil conspiracy.

A private actor and a public actor working in concert can form a civil conspiracy to violate an individual's civil rights under § 1983. Adickes v. Kress & Co., 398 U.S. 144 (1970). A plaintiff "must establish that (1) defendants deprived him of a right secured by the Constitution or laws of the United States and (2) conspired to do so *while acting under color of state law.*" Dennison v. Penna. Dept. of Corrections, 268 F. Supp.2d 387, 401 (M.D. Pa. 2003) (emphasis added). In order to plead conspiracy under § 1983, a plaintiff "must allege specific facts suggesting that there was a mutual understanding among the conspirators to take actions toward an unconstitutional end." DiNicola v. DiPaolo, 945 F. Supp. 848, 856 (W.D. Pa. 1996).

To sustain a conspiracy claim under section 1983, a plaintiff must establish the following: "(1) the existence of a conspiracy involving state action; and (2) a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy." Marchese v. Umstead, 110 F. Supp.2d 361, 371 (E.D. Pa. 2000) (citations omitted). Plaintiffs fail to make the compulsory second allegation regarding a deprivation of civil rights in furtherance of the conspiracy by a party to the conspiracy. Id. As previously discussed, Plaintiffs have failed to demonstrate the deprivation of a constitutional right. Section 1983 does not create a cause of action per se for conspiracy to deprive one of a constitutional right. Without an actual deprivation, there can be no liability under Section 1983. Garner v. Township of Wrightstown, 819 F.Supp. 435, 445 n. 7 (E.D.Pa.1993) (quoting Defeo v. Sill, 810 F. Supp. 648, 658 (E.D. Pa.1993))(internal quotation marks omitted), aff'd, 16 F.3d 403 (3d Cir.1993); see also Holt Cargo Sys., Inc. v. Del. River Port Auth., 20 F. Supp.2d 803, 843 (E.D. Pa.1998) (finding that there can be no liability for a conspiracy to violate Section 1983 without an actual violation of Section 1983 ), aff'd, 165 F.3d 242 (3d Cir. 1999). Without any showing of a

violation of their constitutional rights, Plaintiffs' Section 1983 conspiracy claim fails as a matter of law.

As we stated previously, plaintiffs have not alleged the violation of a right secured under the Constitution or laws of the United States, and in addition, plaintiffs have not adequately plead that there was a mutual understanding among the alleged conspirators, and has not alleged acts which were specifically undertaken in furtherance of this conspiracy. We will therefore dismiss the conspiracy claim as alleged in Count VIII.

## IV. Conclusion

For the reasons stated here, the motions to dismiss will be granted in part and denied in part, consistent with this Opinion. An appropriate order will be entered.

Date:   September 28, 2006

Maurice B. Cohill Jr.
**Maurice B. Cohill, Jr.**

42