## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

PAUL BRYAN and BONNIE BRYAN,   )
husband and wife, individually and as   )
parents and natural guardians on behalf of   )
their minor child, K.B., and K.B.,   )
   )
      Plaintiffs,   )
   )
      v.   )     C.A. No. 03-259 Erie
   )
ERIE COUNTY OFFICE OF CHILDREN   )
& YOUTH, et al.,   )
   )
      Defendants.   )

### MEMORANDUM OPINION

SEAN J. McLAUGHLIN, District Judge.

Plaintiffs' original complaint was filed on August 12, 2003 and was dismissed by the Honorable Maurice B. Cohill, Jr. pursuant to Fed. R. Civ. P. 12(b)(6) by Opinion and Order dated September 28, 2006.[1]  In that Order the Court dismissed the Erie County Office of Children & Youth ("OCY") defendants (and other defendants, unnamed herein in the First Amended Complaint) from all eight counts set forth in the Plaintiffs' original Complaint.  On August 18, 2008, the United States Court of Appeals for the Third Circuit vacated that order with the directive that the Plaintiffs be permitted to amend their original Complaint.

On remand the Plaintiffs did so. The cause of action arises out of sexual assaults by J.O., a minor foster child placed in the home of Plaintiffs Paul and Bonnie Bryan.  The Bryans have brought this lawsuit individually and as parents and natural guardians of their son, K.B., the

---

[1] Judge Cohill recused from this case pursuant to 28 U.S.C. § 455 on June 21, 2011.  The case was thereafter assigned to this member of the Court.

victim of the assaults, against the OCY and several of its present or former employees.[2] At Count

I,  Plaintiffs claim that the Defendants violated K.B.'s federal substantive due process rights

pursuant to 42 U.S.C. §1983 by virtue of their involvement in placing J.O. in the Bryan home.

Count II alleges intentional infliction of emotional distress.    A motion to dismiss the First

Amended Complaint was denied on May 13, 2009.

Presently pending before the Court is a motion by the Defendants for summary judgment.

The issues have been briefed and argued and the Court has reviewed the rather extensive record.

Oral argument was held before the undersigned on July 21, 2011. Accordingly, Defendants'

motion is ripe for disposition.  For the reasons that follow, the motion will be granted in part and

denied in part.

This Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 1331, 1343(a) and

1367(a).

## I.  STANDARD OF REVIEW

In adjudicating a motion for summary judgment, we apply the well-established legal

standard presently set forth in Fed. R. Civ. P. 56(a), pursuant to which summary judgment shall

be granted when no genuine dispute exists as to any material fact and the moving party is entitled

to judgment as a matter of law. Fed. R. Civ. P. 56(c). "A disputed fact is 'material' if it would

affect the outcome of the suit as determined by the substantive law," *Bouriez v. Carnegie Mellon

Univ.*, 585 F.3d 765, 771 (3d Cir. 2009) (citation omitted), and a factual dispute is "genuine,"

and thus warrants trial, "if the evidence is such that a reasonable jury could return a verdict for

the nonmoving party." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248–49, 252, 106 S.Ct. 2505,

91 L.Ed.2d 202 (1986). Accordingly, in order for a claim to survive summary judgment, "there

---

[2] The individuals named as Defendants in this case are Paul Cancilla, Carmen E. Merritt, Renie Skalko, Cindy Baxter, Brigitte Sullivan, and Cindy Lewis.

2

must be [significantly probative] evidence on which the jury could reasonably find for the plaintiff." *Id.* For purposes of Rule 56, we assume that the non-moving party's allegations are true and give the non-moving party the benefit of the doubt when those allegations conflict with the moving party's claims. *Valhal Corp. v. Sullivan Assocs.*, 44 F.3d 195, 200 (3d Cir. 1995). However, summary judgment must be entered against any party unable to present sufficient evidence in support of an essential element of a claim because "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

With this standard in mind, we review the evidence of record. Except as otherwise indicated, the following facts are undisputed.

## II. BACKGROUND FACTS

A.  **Events Leading to J.O.'s Placement**

On January 12, 1998, OCY caseworker Cyndi Steves (hereinafter, "Steves") petitioned the Erie County Court of Common Pleas, and the court entered an order that J.O. be detained in an emergency shelter within seventy two hours.  (Defs.' Exs. A, B ). On January 16, 1998, Steves prepared an intake opening document which amassed detailed background information, and included a subsection known as a "risk assessment summary."[3]  (Defs.' Ex. C.) In her intake opening document, Steves stated:

> Both parents, along with their spouse or significant other, contacted this Agency and requested [J.O.]'s placement as none of the adults felt they could deal with his special emotional issues. [J.O.] has been diagnosed attention deficit/hyperactivity disorder along with conduct disorder.   [J.O.] takes three different medications in an attempt to assist him in controlling his behavior. . . .  He is physically violent, according to his parents, hitting, kicking and biting.

---

[3] The risk assessment summary informs the child welfare authorities' decision as to whether the child should remain in the home and, if so, to ascertain what safeguards need to be in place in the home.  (Pls.' Ex. H at p. 117.)

* * *

> It was reported that the boy was fascinated with fire in the past and has been found playing with matches.  ***It was also reported that [J.O.] was acting out sexually with a half-sister and a niece in North Carolina.***  Both parents also report the child is verbally threatening to blow things up, shoot people and stab people.  He is reported to suffer from both enuresis and encopresis.
>
> The child resided in the home with his mother from birth to 7 years old.   [His mother] states that at age 3 she was having behavior problems with the child and did seek out services . . .  Since none of this was effective, she made arrangements for the child to stay with his father.  [J.O.] resided with his biological father for approximately one year during which time family tension increased and they felt they could no longer keep the child.  Arrangements were made for [J.O.] to go stay in North Carolina with an extended family member.  ***Supposedly, when [J.O.] was in North Carolina he acted out sexually with a younger child in that residence, and also was a behavior problem.***  After approximately one year, the relatives in North Carolina could no longer keep the child.  They made arrangements for [J.O.] to come back to Pennsylvania and stay with his father again.

(*Id.)* (emphasis added).  As to the incident in North Carolina, Steves had not yet had the opportunity to speak with the "extended family member" in North Carolina who had custody of J.O. for approximately one year, and she suggested "it would be informative for someone to contact this person to obtain additional, first- hand information." (*Id.*)

When J.O. returned to the Erie area, his father and stepmother again suffered additional challenges, and ultimately took him to Clarion Psychiatric Hospital where he was admitted for approximately two weeks.  (*Id.*)  Upon his discharge, the father and stepmother did not want to continue to provide for J.O. and sent him back to his mother.  (*Id.*)

Steves interviewed each family member.  J.O. told her that he did not get along with his half-siblings, who continually lied about him.  (*Id.*)  He denied any wrongdoing, and also denied that he had been physically or sexually abused. (*Id.*)  J.O.'s mother told Steves that his behavior was so extreme that the stress from living with him exacerbated her poor physical health and debilitating asthma. (*Id.*)  J.O.'s mother's live-in boyfriend had issued an ultimatum that if J.O. were to return to his mother's care, he and his daughter would move out.  (*Id.*) J.O.'s father and

stepmother described  J.O. as not having "any remorse or any conscience" and did not want to

leave him alone, given his behaviors.  (*Id*.) They likewise were not willing to have him return to

their residence as they felt he needed more help than they were capable of giving.  (*Id*.)

Steves also interviewed J.O.'s half-sister.  She stated that there were two occasions when

J.O. "had gotten on top of her in her bed" when she was fully clothed.  (*Id*.)   Steves summarized

the information obtained from J.O.'s half-sister as follows:

> On the first occasion three years ago, both [the half-sister] and [J.O.] were fully clothed
> and [J.O.] was just laying on top of her.  When [she] came upon this sight she told [J.O.] to get
> off [the girl's] bed and to leave her alone.  On the second occasion a month later, [J.O.] was
> found with his pants off laying on top of [her], who was again clothed.  [She] stated that she was
> attempting to push [J.O.] off of her and that she told him to go put his pants on.  [The half-sister]
> stated that [J.O.] never tried to touch her or have her touch him.

(*Id*.)

On January 26, 1998, Jeff Rose (hereinafter, "Rose"), a caseworker in the sexual abuse

unit at OCY assigned to J.O. after the intake procedure, completed a Protocol for Placement

Review by Resource Management Team Document.  (Defs.' Ex D at EC 1019-1020.)  Rose

testified that he had ruled out any foster home placement for J.O. because "[t]he behaviors cited

by both parents would indicate this child would be a danger to himself, other foster kids and the

foster home."  (Pls.' Ex. P at 99.)  Rose requested residential or group home placement (as

opposed to foster home) because "J.O. was "diagnosed w/ADHD, conduct disorder, he

supposedly sexually acted out, started fires, self-abusive, bangs his head eneuretic, encopretic,

plays w/knives & numerous other acting out behaviors."  (Defs.' Ex. D at EC 1019.)

Despite J.O.'s denial that he had been sexually abused, given his behaviors, child welfare

authorities continued to explore that possibility.  (Pls.' Ex. B at p. 35.) While J.O. was at the

Edmund L. Thomas Shelter, on February 23, 1998, after holding a dispositional and placement

review hearing, the Court of Common Pleas of Erie County entered an order that the OCY's

Service Plan be adopted and that pursuant to that plan, *inter alia*, J.O. was to be placed with

OCY for an indefinite period and to be assessed for the Sexual Abuse Initiative, including a

psychological evaluation by Dr. Jerome L. Troncone.  (Defs.' Ex. E at EC 956.)   The Court

ordered that "[J.O. was] to cooperate with this evaluation and any needed services to address any

past issues of sexual abuse as well as his sexualized behaviors." (*Id.*)  The court also approved

the use of a County Wrap facilitator who would assist in accessing Therapeutic Support Services

("TSS") as well as mobile therapy, if necessary.   (*Id.* at EC 957.)   She further ordered that J.O.

"become reinvolved with Family Based Mental Health services to address his behavior acting

out, verbal aggression, lack of following established rules, poor socialization skills and any other

needs as assessed by the Family Based Mental Health worker.  (*Id.*)

Rose's misgivings concerning the suitability of foster care notwithstanding, J.O. was

moved out of the emergency shelter and into a foster home, where he resided  from February 27,

1998 until June 22, 1998. (Defs.' Ex. G).  "[T]hat placement contained almost daily conflict

between [J.O.] and the other foster children due to the punitive nature of the foster mother's

approach to discipline and her increasing frustration with [J.O.]'s behavior, which was

decompensating significantly."  (Defs.' Ex. TT at EC 1657.)  Accordingly, J.O. was moved to

yet another foster home from June 24, 1998 through August 18, 1998. (*Id.*)

Pursuant to court order, OCY referred J.O. to Dr. Troncone who determined that J.O. was

not a sexual perpetrator. (Defs.' Ex. F at EC 1352.)  Dr.  Troncone submitted his psychological

evaluation to the OCY on July 24, 1998.  (*Id.* at EC 1351-1353.)  Dr. Troncone reached his

conclusion after having interviewed caseworker Rose, J.O., J.O.'s natural mother, as well as

reviewed the evaluations by Clarion Psychiatric Center and J.O.'s school.  (*Id.*)  Despite the

information gathered at intake, according to Dr. Troncone, "[t]here [was] no documented history

of this child sexually acting out." (*Id.*) J.O.'s mother indicated that she had had an "extremely difficult time adjusting to her son's high levels of energy, disruptive behaviors such as fire setting, disobedience, and running away from her.  She indicated that she had asthma and was incapable of caring for her son  . . ." (*Id.*)

In his report to the OCY, Dr. Troncone stated that J.O. had "denied all activity associated with any sexually non-appropriate activity with girls or boys either his own age or younger." (*Id.* at EC 1352.)  He concluded that J.O. was "responding more like a victim of poor family dynamics rather than acting as a perpetrator or carrying largely perpetrator dynamics." (*Id.* at EC 1353).  Dr. Troncone concluded that J.O. was "not appropriate for the Sexual Abuse Initiative since he primarily was operating as a victim and there [was] no substantiating evidence that he was engaged in sexually destructive behavior." He recommended that J.O. "continue to see a counselor . . . for basic psychoeducational instruction on sexuality, and boundaries." (*Id.* at EC 1353, ¶¶ 1, 2.)

J.O. was placed at Hamot Behavioral Health, a mental health facility, from August 18, 1998 through August 27, 1998. (Pls.' Ex. B at p. 38.)  This was necessitated by a "suicidal gesture." (Pls.' Ex. E at EC 707.)  The attending physician diagnosed him as suffering from conduct disorder, attention deficit disorder with hyperactivity, and dysthymia. (Defs.' Ex. UU.)

Upon release, with no other resources available for him, J.O. was placed in the Edmond L. Thomas Shelter from August 27, 1998 to October 2, 1998.   (Defs.' Ex. G; Pls.' Ex. B at p. 39.).  While there, on September 10, 1998, caseworker Rose prepared a risk assessment summary for the time period from August 21, 1998 through September 10, 1998. (Pls.' Ex. E)   Rose reported that the stepmother stated that she and J.O.'s father "had planned their marriage, their family and their lives and [J.O. did]  not fit into that plan, especially with his behaviors. . . [They

both] . . . stated they feel [J.O.] could be the next Jeffrey Dauhmer [sic]." (*Id.*)  Rose concluded,

"[h]is behavior and mental health have deteriorated in the last month and [J.O.]'s needs now

include placement in a residential treatment program for his safety and the safety of others."

(*Id.*)

From October 2, 1998 to August 30, 1999, J.O. resided at Sarah Reed Residential, where

he "presented with emotional and behavioral challenges throughout this placement."  (Defs.' Ex.

G.)  In a April 30, 1999 review hearing Transfer Summary, it was recommended that J.O. remain

in residential treatment.  (Defs.' Ex. VV at  EC-737.) The following was also reported:

His behavior is reported to be out of control with physical aggression, biting, and kicking.

. . .

[d]uring the past year, there have been no reported incidents of plying [sic] with fire or fire
setting, [or] sexualized behaviors"  [although J.O. continued] "to struggle with impulse control,
acting out behaviors, and appropriate response to authority.  [J.O.]'s behavior has regressed in
the area of depression, which, as has been stated, is directly related to the fact that he cannot
understand why he cannot return home.

(*Id.* at  EC-735.)  Due to his depressed behavior and "poor progress in all areas, the team

recommended that he remain at Sarah Reed Residential."  (*Id.* at EC-736.)

Four months after this recommendation, J.O. was placed in another foster home, from

August 30, 1999 through October 4, 1999.  While there, according to Harborcreek admission

materials, he showed "non-compliant behaviors as well as being physically aggressive and

exhibiting sexually inappropriate behaviors during the second month of his foster care." (Defs.'

Ex. G at p. 69.)  It was further reported that he had made sexually inappropriate comments to

girls on the school bus, had "mooned" children and had been found masturbating in his room.

(*Id.*)  He had also been aggressive toward other boys in the foster home, including pushing a six

year old down who hit his head on the floor.  (*Id.*)

OCY employees were aware of J.O.'s conduct.  Defendant Renie Skalko (hereinafter, "Skalko") was the OCY caseworker[4] assigned to J.O.'s case throughout the relevant time period (from September 1999 through May of 2001); she also worked with defendant Cindy Baxter (hereinafter, "Baxter") in the host family program. (Pls.'s Ex. B at p 19, 26, 28, 40.)   Skalko was aware that J.O.'s biological father had "reported that . . . J.O. was sexually acting out with a half-sibling in the home." (*Id.* at p. 35.)   She also was aware that a foster mother had asked that he be removed from her home because he had "mooned" other kids on the bus, made sexually inappropriate comments to other children, either at the foster home or at school, and that he was not willing to work with Wraparound services or TSS.  (*Id.* at p. 42.)

From October 4, 1999 through December 9, 1999, J.O. was back at the Edmond L. Thomas Shelter.  (*Id.*)  In the shelter he "presented in a manageable fashion, with periods of both 'ups' and 'downs' in his behavior."  (Def.'s Ex. G)  He was ultimately moved from there as well.

**B.   J.O. resides at Harborcreek Youth Services Residential Treatment Facility**

1.  Admission and Identification for Host Family Program

On December 9, 1999, J.O. was admitted to Harborcreek Youth Services Residential Treatment Facility.  (Defs.' Ex. G.)  Harborcreek is a residential facility for children with behavioral/sexual offender and mental health issues.  (Pls.' Ex. H at p. 42.)   As of that date, J.O. had not been adjudicated for any sexual offense, (Pls.'s Ex. G at p. 56), although upon admission, his troubled history of behavior at the foster homes was laid plain.   Under "Educational Concerns" it was reported that in September, 1999 he had been kicked off the school bus for threatening other students, swearing at the bus driver and not staying in his seat. (Defs.' Ex. G at p. 68.)   In addition, his school principal reported he had sworn at teachers and

---

[4] Skalko's supervisor was Carla Krott, who is not a defendant.  (Pls.' Ex C at pp. 67-68.)

was running in the halls.  (*Id.*)  Harborcreek's admission materials noted that J.O.'s special

treatment needs included "impulsivity, socialization, anger management, feelings of

abandonment and his negative feelings toward his father and stepmother."  (*Id.*)  The admission

material made note that he continued to struggle with the fact that he could not return to the care

of his parents.  (*Id.* at p. 69.)  Harborcreek's admission materials chronicled the following

behavioral problems:

> swearing at the foster parents and other children, stealing, mooning other children in the
> neighborhood, messing in his pants and hiding the pants, being aggressive toward the other boys
> in the foster home, and he pushed a six year old down who hit his head on the floor.  Foster
> parents also reported sexual acting out by stimulating himself against the side of the bed and he
> had been making sexually inappropriate remarks to girls in school and on the school bus.

(*Id.*)  Three "high risk activities" were noted:  fire-setting, "needed restraint," and sexual acting

out.  (*Id.*)

J.O.'s resided in Harborcreek's restrictive environment from December, 1999 through

March 30, 2001, at which time he was placed in the Bryans' home.  (Pls.' Ex. G at p. 9, 35;

Defs.' Ex. Z.)  As part of his treatment, Harborcreek  implemented an Individual Service Plan

("ISP").  (Defs.' Ex. I.)   The course of treatment for J.O.  included therapeutic life skills group

counseling for one-hour per day, six days a week, one-hour individual sessions twice per week,

therapeutic task sheets which focused on individual treatment goals and objectives, appointments

with clinical child psychiatrist Charles R. Joy, M.D., and attendance at Harborcreek Youth

Services Campus school.  (*Id.*)

On November 1, 2000,  after a permanency hearing, the Erie County Court of Common

Pleas found, *inter alia*, that "[t]he appropriate and feasible placement goal for the child is

placement in another living arrangement intended to be permanent in nature," although

placement at Harborcreek "continues to be necessary and appropriate." (Defs.' Ex. H at EC 930.)

The court ordered that OCY continue to explore and locate appropriate discharge resources for J.O., and upon location of an appropriate resource, permitted visitation between the family and J.O. (*Id.*)   The OCY was further ordered to continue working on identifying a "host home" for J.O. (*Id.*)

As of November 9, 2000, Harborcreek records reflect that:

[J.O. l]ikes to swear and curse when angry.  When angry [he] tends to slam doors and will isolate himself in his room.  [He] can be intrusive and impulsive, and explode without notice.  [J.O.] demonstrates physical aggressive behavior around other youth.  [J.O.] demands to have his own way and when not given his way [he] will instigate, cry, scream, throw, and throw a "hissy-fit" and disrespect authority figures.

(Defs.' Ex. I at 967.)

The OCY host family program, which the court had referenced in its permanency hearing findings, was designed to help older foster children transition and succeed in a foster home, by establishing a relationship or bond with the family prior to permanent placement.  (Pls.' Ex. I (Vol. I) at p. 97.) To that end, older children visited host family households for short one- or two-day stays on weekends.  During the balance of the week, the child remained at the residential treatment facility ("RTF") for intensive treatment.  (Pls.' Ex. Q at p. 50.)  Host home providers received information about the child from the caseworker and were members of a treatment team which met periodically while the child was in residential care to discuss the child's progress.  (Pls.' Ex. H at p. 23.)

Baxter identified the Bryans as a potential host family for J.O. at the request of her supervisor, Paul Cancilla.[5]  (Pls.' Ex. H at p. 41.)  The Bryans, who had been foster parents for Crawford County and other agencies for many years, began their foster parent training with the OCY in November, 2000.  (Pls.' Exs. H at p. 62;  Pls.' Ex. I (Vol. II) at p. 96-97.)  By one

---

[5] Paul Cancilla, then OCY director of foster care services, did not work directly on J.O.'s case file.  (Pls.' Ex. J at p. 43.)

account, they had fostered 45 children up to that point.  (Defs.' Ex. AAA at p. 5.)  Several months prior, in April of 2000, the Bryans had formally adopted plaintiff K.B., who had lived with them as a foster child beginning when he was six years old  in January of 1998.  (Pls.' Ex. I (Vol. I) at p. 22.)  The Bryans resigned as foster care parents for Crawford County upon adoption of K.B on May 14, 2000. (Pls.' Ex. I (Vol. II) at p. 62-63.)

On November 3, 2000, the Bryans completed a foster Home Study form on which they indicated that they did not want a foster child that was a fire-setter or "severe sexual offender." (Pls.' Ex. J at p. 140.)   This form was submitted to Baxter.  (*Id*. at 141.)   Skalko was aware of the content of the form.  (Pls.' Ex. B at pp. 167-69.)   At deposition she agreed that there were sufficient allegations to lead to the conclusion that, at a minimum, J.O. was a suspected past sexual offender.  (*Id*. at pp. 169-71.)

Baxter recalled that at the time the Bryans were identified as a host family, OCY employees were aware that J.O. had sexually acted out.  She testified that she was aware that J.O. had some "sexual[ly] inappropriate behavior with a sister," while in foster care he had touched the bottom or hit the bottom of a female, had "mooned" somebody on the bus, and while in foster care, had spoken in an sexually inappropriate way to children his age.  (Pls.' Ex. H at 45-46.)

The Bryans were introduced to J.O. in November of 2000 at a preliminary meeting at Harborcreek. (Pls.' Ex. Q at p. 48.)  After some deliberation they decided to move forward as a host family.

Skalko and Baxter met with the Bryans in their home on November 17, 2000. (Pls.' Ex. B at p. 48.) There is a disputed issue of material fact as to what the Bryans were told about J.O.'s history.  According to Skalko, his behaviors, his diagnoses, the reasons he was placed in Harborcreek were discussed, as well as the workings of the host family program.  (*Id.* at p. 49.)

It was OCY policy, as reflected in the foster care manual in effect at the time, to "give the foster parents as much information as possible or available to help the child settle into their home" including allegations of prior sexually inappropriate or aggressive acts towards other children, the nature of those acts, as well as the number of prior placements in the foster care system. (*Id.* at pp. 159-60.)  Skalko recalled telling the Bryans:

[t]hat both J.O.'s parents were not willing or unable to take care of him.  And he had no contact with either parent.  And the mother had a lot of medical issues.  And the father wasn't able to control his behaviors because of the sexually acting out with another sibling in the home.

Q.  You told the Bryans at that time that the biological father had been unable to control J.O.  . . . because J.O. had been sexually acting out with another sibling in the home?

A.  Yes, as well as defiant behaviors.

Q.  And did you specify exactly the nature of the sexual acting out?

A. No, because we didn't know.

Q.  Anything else about his sexual history that you discussed at that time?

A.  The – why he was removed from the most recent foster home.  The mooning of other children, as well as making sexually inappropriate comments to other children.

Q.  Anything else that you discussed about his sexual history in that meeting of November 17th?

A.  They were told that J.O. is at Harborcreek, and he's receiving individual and group counseling through their sex offending – offender program.  And that they were working with him on that.

(*Id.* at p. 50-51.)

Baxter testified that at her first in-depth meeting with the Bryans in the fall of 2000 she gave them detailed information concerning J.O.:

That he was not living with the mother or father, and that he was in residential.  His mental health diagnosis, his behavioral issues, and his sexual acting-out issues.  We also talked about what his needs would be.  What type of situations to – that he's in now, which would be the residential.  And if they were interested at all in learning more about him.  At that point we

weren't requesting would they be his host home.  We were asking would they like to learn more about him to become his host home.

(*Id.* at p. 67.)

Baxter also recalled that at her first meeting with the Bryans they were told that J.O. "was out of control while in both [parent's separate] homes. . . . He had a sexual acting out with his sister, but [she] didn't know the specifics on that."  (*Id.* at p. 68.)  She further testified that the Bryans were told that J.O. had "touched or hit a girl on her bottom," had "mooned somebody on the bus," and had some "verbal sexual inappropriate behaviors."  (*Id.* at p. 68.)  Baxter admitted that at the time she approved the Bryans as foster parents, she was aware that their son K.B. was living in the home and that he was four years younger than J.O.  (*Id.* at p. 214.)

Paul Bryan testified that at the first meeting he and his wife were only told that J.O. "had issues" but they were not told what the issues were.  (Pls.' Ex. Q at p. 59.)  He recalled being told only that J.O.'s mother didn't want him because she was changing husbands and that J.O. was oppositional defiant and had ADHD.  (Pls.' Ex. Q. at p. 61)  When he asked why prior foster care placements had been discontinued, he claimed he was told that "[i]t just didn't work out."  (Pls.' Ex. Q at p. 62.)  Bonnie Bryan testified that they were told simply that J.O.'s parents were divorced and that neither parent wanted him.  (Pls.' Ex. I (Vol. II) at p. 54.)

2.  Inter-Agency Treatment Team Meetings

William P. Kohler was employed by Harborcreek as Administrator of Clinical Services and was charged with the responsibility of reviewing, approving, and monitoring the implementation of the treatment plan agreed upon by the Inter-Agency Treatment Team involved in transitioning J.O. to the Bryan family as a foster child.  (Defs.' Ex. K at ¶¶ 2, 3.)  As will be discussed in more detail *infra*, there also is a genuine dispute of material fact as to what was disclosed to the Bryans at these meetings.

In his affidavit Kohler explains that at their regular meetings, the team discussed J.O.'s strengths, weaknesses, and needs for services. (*Id.*) Attendees signed an Inter-Agency Service Plan ("ISP") sign in sheet, as well as a treatment plan sign in sheet. The ISP meeting sign-in sheet indicated that a person was present at the meeting and the Treatment Plan sign-in sheet reflected that the signatories were aware of the treatment plan being proposed for that resident. (Defs.' Ex. MM at p. 58.) After the meeting, ISP Progress notes were prepared, which allegedly reflected the substance of the discussion at the meeting. (Defs.' Ex. OO at p. 56; Pls.' Ex. I (Vol. II) at p. 56.)

The record contains sign-in sheets which establish that between November 30, 2000 and March 15, 2001, while J.O. was visiting her home periodically on weekends under the host family program, Ms. Bryan attended six ISP meetings held on November 30, 2000, December 19, 2000, January 29, 2001, February 12, 2001, February 26, 2001, and March 15, 2001. (Defs.' Ex. K at ¶ 10.) According to William Kohler, and others, during at least five of those meetings (all but the one held just prior to discharge on March 15, 2001) J.O.'s history of sexually inappropriate behavior was discussed, and recommendations were made that J.O. either engage in or continue with treatment through Sexual Counseling Services ("SCS"). (*Id.* at ¶ 11; Defs.' Ex. NN at pp. 19, 27, 31-32.) This program provided counseling for individuals exhibiting a broad spectrum of sexually inappropriate behaviors, ranging from sexually acting out to actual sexual offenses. (Doc. 136 at p. 14.)

On December 19, 2000 the treatment plan sign in sheet was signed by the following: William P. Kohler (Administrator of Clinical Services), Dennis C. Overmoyer (Director of Residential Treatment Facility), Merritt L. Kleiner (Mental Health therapist), Barry Kohler (MH/MR Representative), Renie Skalko (County Placing Agency Representative) and Ms.

Bryan. (Defs.' Ex. J.)   The ISP report period being discussed that day was effective up to

November 9, 2000, and spanned the eleven months prior thereto.  (*Id.*)  It explained the reason

for placement, course of treatment, participation, strengths, limitations, visitation plans, and

discharge plan.  (Defs.' Ex. I.)  The ISP then broke down into subcategories the various issues

that Harborcreek staff were hoping to address.   These included "sexually inappropriate

behaviors."  (*Id.*)  The stated objective was that J.O. would stop all inappropriate behaviors, as

would be evidenced by no reports of sexually inappropriate behaviors generated. (*Id.*)  These

objectives were subject to monthly review. (*Id.*)

Ms. Bryan, however, denied ever seeing the document containing that information or

discussing it with OCY personnel.  (Pls.' Ex. I (Vol. I) at p. 118.)  When asked if they discussed

J.O.'s treatment on December 19, 2000, she answered:

> A.  No.  Actually, I can honestly say I don't think we discussed his whole treatment plan
> because foster parents are not privileged to that.  We only get to know the information that we
> need to provide a safe home for everyone. . . We never discussed his whole treatment plan.

(Pls.' Ex. I (Vol. II) at p. 24.)

Ms. Bryan testified that in her early meetings with OCY she was told by Skalko only that

J.O. was oppositional defiant, suffered from ADHD, anxiety and mood disorders.  (Pls.' Ex. I

(Vol. I) at p. 96.)   She denied being told specific information about J.O.'s treatment at

Harborcreek:

> [A]s a host parent or a foster parent, we are not privileged to everything that is discussed
> in treatment on a foster child or any other minor child.  We are not privileged to be part of that
> treatment until they are in our home, and then it is limited to you taking them to therapy or to the
> doctor.  Then those professionals send everything to the case workers.  None of their written
> information or records come to us as foster parents.  So those meetings were more general.  How
> is J.O. doing?  What are we working on?  School type issues.

(*Id.* at p. 108.)

Ms. Bryan attended a subsequent Inter-Agency Treatment team meeting on January 29, 2001.  The attendance sheet, which she signed, reflected that she would be receiving confidential information at that meeting.  (Defs.' Ex. M, N, and JJ at pp. 26-28.)  According to the ISP Progress notes for that date, drafted by Merritt Lynn Kleiner (the mental health therapist at Harborcreek) it was reported to the team that J.O. was making mixed progress:

> J.O. continues to have difficulty in discussing his emotions, often minimizing emotions even when asked. . . [His] anxiety level has been steadily increasing as discharge draws closer.  He states that he is happy with this foster family and that he wants to go there because he has been at the RTF "long enough." . . . Anger management is not an issue on the unit. *[J.O.] continues to participate and progress in the SCS component of his treatment.*

(Defs.' Ex. O) (emphasis added).   The four-pronged plan for J.O. included that he "continue the Sexual Counseling Services component of treatment."  (*Id*.)  Ms. Bryan could not recall any specifics of that meeting.  (Pls.' Ex. I (Vol. II) at pp. 26-28.)  She testified that the first time that she became aware that J.O. was receiving sexual counseling services as a component of his treatment was when these documents were shown to her at deposition.  (*Id.* at p. 51.)

In support of this contention that they were not fully informed as to J.O.'s background, the Plaintiffs also rely on the testimony of Barry L. Kohler (not to be confused with William P. Kohler), who was employed in the Wrap –Around Division of Case Management Support Services, a private agency, and was charged with the responsibility of  advocating for services on behalf of children who were under OCY's care. (Pls.'s Ex. K at pp. 10, 12.)  Beginning in June of 2000, when he became involved with J.O., Barry Kohler attended inter-agency service planning team meetings on behalf of J.O. once he was placed at Harborcreek.  (*Id.* at p. 13.)  His job was to coordinate mental health services for J.O. (*Id.* at p. 34.)

In that capacity, Kohler attended the meetings on December 19, 2000, January 29, 2001

(as well as February 26, 2001). (Defs.' Exs. J, M, N, and Q.)  He testified that he had no

knowledge that J.O. had sexually acted out between June of 2000 and August 2001.  (Pls.' Ex. K

at pp. 35, 38.) In addition, despite having attended these meetings, Kohler testified as follows:

Q.  Did you ever have any information at any time that JO had a history of sexual abuse?

A. No.

Q. At any point in time did you ever have any information regarding the fact that JO had
sexually abused other children?

A. No.

(*Id.* at p. 58.)

 Michael Conti, J.O.'s primary counselor at Harborcreek, and Skalko both testified that

the Bryans would have been informed that J.O. was participating in the SCS program at

Harborcreek.  (Defs.' Ex. NN at pp. 41-42, Pls.' Ex. B at p. 62.)

On February 19, 2001, a letter was sent to Bonnie and Paul Bryan which notified them of

an upcoming Inter-Agency Team Meeting to be held on February 26, 2001.  (Defs.' Ex. P.)

Ms. Bryan signed the ISP sign-in sheet and Inter-Agency Treatment Plan sheet for the February

26, 2001 meeting.  (Defs.' Exs. Q, R and LL at pp. 46-51).  The ISP Progress notes, drafted by

Merritt Lynn Kleiner after the February 26, 2001 meeting, state that  "[J.O.] continue[d] with

Sexual Counseling Services component of treatment."  (Defs.' Ex. S; see also Defs.' Ex. NN at

pp. 28-35.)

At that meeting, Ms. Bryan signed an Inter-Agency Treatment team document entitled

"Statement of Confidentiality"; receipt of such was acknowledged by team members Barry

Kohler, Merritt Lynn Kleiner, Skalko, and Baxter.  (Defs.' Ex. U.)  The Statement of

Confidentiality referenced the fact that the team was obtaining confidential information to be

used to develop a comprehensive individual service plan for J.O.  (*Id.*)  The "Inter-Agency Treatment Team Plan for [J.O.]" states that the team had met on February 26, 2001 to review J.O.'s service needs.  (Defs.' Ex. V.) A goal for residential treatment was to reduce J.O.'s sexual inappropriateness with others in the community and learn sexually appropriate boundaries." (*Id.*). A second goal was "[t]o continue to assist [J.O.] with improving his social skills so that he can reduce his impulsivities and instigating behaviors with peers and develop better peer relationships."  (*Id.*)  According to the plan, Residential Mental Health Treatment Services would include, *inter alia*, "intensive individual therapy and behavioral management", including sex education, as well as group therapy, family therapy, psychiatric monitoring and medication management. (*Id.*) The first of six therapy goals was that he would have "[a]n ability to understand the inappropriateness of his sexual gestures and improve his sexual and personal boundaries." (*Id*. at pp. 1, 2.)

Again, Ms. Bryan denied ever seeing a document relative to sexual counseling services prior to her deposition.  (Pls.' Ex. I (Vol. II) at p. 51.)

As previously mentioned, OCY personnel take issue with the Bryans' contention that they were not fully informed as to J.O.'s background.   Baxter maintained that it was OCY's custom and practice to disclose all information to potential foster or host parents regarding the past sexual history of a child.  (Pls.' Ex. H at p. 114.) "That's why we have meetings not only with the parents, but at the facilities, residential facilities."  (*Id.* at p. 116.)  Baxter stated that any sexually aggressive behavior or predatory tendencies would have been disclosed because:

Our job is not to name other people involved.  Just explain exactly how this child would have been involved.  The job of OCY is to try to get appropriate foster homes for children, and host homes.  In order to do that, if we want it successful, all information we have about all children is disclosed.  Otherwise you don't have a successful placement.

(*Id.* at pp. 90-91.)

At her deposition, Baxter was shown documentation from J.O.'s initial intake questionnaire, wherein it was reported that his natural father referred to him as a future "Jeffrey Dahmer." The Bryans were never told that J.O's natural father referred to him in that fashion. (*Id.* at pp. 53, 89) Baxter explained that the Bryans were never informed of the statement because it would not have been relevant to J.O.'s "current position" and had not come from "an appropriate resource" such as a psychiatrist or psychologist. (*Id.* at pp. 122-23.)

Defendant Cindy Lewis (hereinafter, "Lewis") became J.O.'s caseworker beginning in June, 2001 after he was placed in the Bryans home as a foster child. Based on her review of J.O.'s record she knew there had been a report that J.O. had acted out sexually against a half-sister and against a niece, and was aware of the shower curtain incident at Harborcreek. (Pls.' Ex. D at p. 26.) She was told by Baxter that Baxter had met with the Bryans and provided them with J.O.'s "background information," including his "behavioral issues." (*Id.* at p. 19.) "I know she talked about going over his history within the record, his treatment, failed foster placement." (*Id.* at p. 20.)

Throughout the latter part of J.O.'s residential treatment at Harborcreek, the Bryans served as hosts for J.O. on weekends, from December 19, 2000 through March 30, 2001. These visits were not without incident. At one time, J.O. returned from a home visit with a magazine or catalogue which had pictures of women in underwear. (Pls.' Ex. H at p. 50.) On another occasion he was found in possession of Plaintiff Bonnie Bryan's underwear, which he had taken from their home. (Defs.' Ex. NN at pp. 58-59.) J.O.'s primary counselor, Michael Conti, characterized this as "serious behavior" which "would raise a red flag for the SCS counselors." (Defs.' Ex. NN at 59.) Conti also recalled that J.O.'s anxiety at one point had escalated to the

point that he became physically aggressive and Harborcreek staff had to physically intervene to calm him down.  (*Id.* at p. 48.)

On March 15, 2001, Ms. Bryan attended another Inter-Agency Treatment Meeting, signed the sign in sheet and Inter-Agency Treatment Plan Sheet.  (Defs.' Exs. W and X.) The following people attended:  Merritt Lynn Kleiner, Conti,  Skalko, Barry Kohler, and Ms. Bryan. (Defs.' Ex. W.)   Consistent with prior practice, after the meeting, Merritt Lynn Kleiner authored an ISP Progress note, which states that "[J.O.] has been formally discharged from the SCS component of his treatment, and is maintaining adequately in school."  (Defs.' Ex. Y.)   In its "Inter-Agency Service Planning Team Sign-in/Concurrence Form" the team members concurred that discharge of J.O. to the Bryans' home was appropriate.  (Defs.' Ex. X.)  Signatories included William Kohler, Merritt Kleiner, Ms. Bryan,  Barry Kohler, Skalko and Baxter.  (*Id.*)

## C.   J.O.  in Bryan Foster Home

On March 28, 2001, OCY caseworker Skalko submitted a "Request for Change in Treatment" to the Court of Common Pleas of Erie County, Honorable William R. Cunningham, in which she explained that at the most recent team meeting, Harborcreek had identified that J.O. was ready for discharge and that the Inter-agency Team had agreed that discharge to the Bryans was appropriate.  (Defs.' Ex. Z.)  This was approved by her supervisor, Carla Krott.  (*Id.*)

Two days later, on March 30, 2001,  J.O. went to the Bryans home as a foster child, where nine-year old K.B. lived.  Baxter knew that two other younger, pre-adoptive children ("R.S." and "T.S."), who were only three and four years old had been placed in the Bryan home on March 28, 2001.  (Pls.' Ex. I (Vol. I) at p. 86.)   On the day J.O. was placed, Merritt Lynn Kleiner composed a discharge summary which states:

Mr. and Mrs. Bryan recognize that issues may resurface and are willing to not only assist [J.O.] in dealing with them, but in providing additional supports, such as outside counseling, as

needed.  They have cooperated with all the outside agencies. . . Taking into consideration the profound amount of abuse and difficult issues that [J.O.] has to deal with, he has demonstrated a high degree of strength, resilience, and growth.  It is the opinion of this therapist that diligent efforts be made to secure a discharge plan with all the appropriate supports as early as possible, as this is clearly in the best interest of the child.

(Def s.' Ex. AA.)

In her the Mandatory Child Health and Educational Data Form dated April 9, 2001 (Pls.' Ex. O), in the section which requests "child's known medical problems to include allergies, physical, mental or emotional", Skalko stated: "Diagnosis → Oppositional Defiant, Attention Deficit/Hyperactivity, Anxiety Disorder/NOS, Borderline Intellectual." (*Id.*)  Ms. Bryan considered this form to be of utmost importance, in terms of its disclosure of J.O.'s medical, educational, and therapeutic goals and needs.  (Pls.' Ex. I (Vol. II) at p. 41.)  She noted at deposition, "[T]here was never anything listed sexual on there." (*Id.* at p. 38.)  Skalko admitted that it would have been "appropriate to put sexually inappropriate behavior on that portion of the form" and that J.O.'s sexually acting out would been an ongoing issue with him at the time the report was filled out.  (Pls.' Ex. B. at p. 147.)  The record also reflects that Skalko did not report in her family service plan dated May 2, 2001 that J.O. could be a danger to himself or others. (Pls.' Ex. B at p. 148-49.)

Following his placement with the Bryans, J.O. continued receiving various "Wraparound" services and other therapeutic and behavioral support.   On May 2, 2001, a Court Summary Permanency Hearing document was prepared, which indicated that the Court had approved J.O.'s placement in the Bryan home and that:

During [J.O.]'s stay at Harborcreek Youth Services, [J.O.] made significant progress with his behavior by managing his behaviors as well as accepting responsibility for his behaviors.

At the present time, the foster family has expressed some concerns regarding [J.O.] being respectful to adults and to others, the issue of personal space and keeping his hands to himself as

well as stealing.  The family is currently working with Joe Ropelewski through the Achievement Center for individual counseling.

He continues to be psychiatrically followed by Dr. Charles Joy  . . .

(Defs.' Ex BB at EC 1068.) Ms. Bryan discussed J.O.'s medication and treatment with Dr. Joy

and J.O.'s therapist Joe Ropelewski.  (Pls.' Ex. I (Vol. II) at pp. 60-61.)  She denied that Dr. Joy

ever discussed with her J.O.'s background of sexually acting out.  (Pls.' Ex. I (Vol. II) at p. 58.)

1. *Door Alarms and Separate Bedrooms*

There is conflicting evidence as to whether the Bryans were advised by OCY employees

that they should use an alarm on J.O.'s bedroom door or were told by OCY employees that J.O.

should have his own bedroom separate from other family members.  The Bryans admit they

owned a door alarm but they claimed they used it to control K.B.'s habit of stealing food.   (Pls.'

Ex. I (Vol. I) at p. 91.)   Both Bryans denied having received an alarm from OCY with

instructions to put it on J.O.'s door or that they were informed by OCY personnel that J.O.

should have his own bedroom.  (*Id*. at p. 93, Pls.' Ex. Q at pp. 66-67.)

In contrast Barry Kohler recalled that there were discussions at Inter-Agency team

meetings while J.O. was residing at Harborcreek that when J.O. visited the Bryans, he should be

placed in the same bedroom with the Bryans' 16 year old son Michael.  (Pls.' Ex. K at p. 45-46.)

Defendant Paul Cancilla (hereinafter, "Cancilla") testified that the Bryans were told by OCY that

J.O. should have his own room. (Pls.' Ex. J. at p. 102.)

Skalko claimed she told the Bryans that J.O. would need his own room and that out of an

abundance of caution, he would need an alarm on his room. (Pls.' Ex. B. at p. 53.)  Skalko

recalled that in either March or April of 2001, when she, Kohler, and  Baxter met with the

Bryans, the Bryans refused to put an alarm on J.O.'s room:  "[T]hey did not feel that they needed

it.  That they felt that they could provide the supervision at all times for J.O." (*Id*. at p. 54, 59.)

23

Similarly, Baxter maintained that at her first meeting with the Bryans, as well as at subsequent team meetings, she told the Bryans that J.O. needed his own bedroom, with an alarm placed on it. (Pls.' Ex. H. at pp. 93-94.)  Baxter specifically recalled that she and Skalko provided door and overhead alarms to the Bryans.  (*Id.* at p. 93, 98.)  Lewis, J.O.'s caseworker who replaced Skalko in June 2001, recalls that Baxter told her she had given the Bryans an alarm for J.O.'s bedroom, "and they didn't want to use them."  (Pls.' Ex. D at p. 20.)[6]

During his weekend visits as part of the host family program J.O. shared a room with a bunk bed with Michael, the Bryans' older son, while K.B. slept in his own small room.   (Pls.' Ex. Q at pp. 53-54; Defs.' Ex. I (Vol. I) at pp. 89-90.) Two days before J.O. was placed, on March 28, 2001 the two younger pre-adoptive children, T.S. and R.S., arrived in the house.   T.S. (a girl) was given K.B.'s small room, and K.B. as moved to a room with R.S. (*Id.* at 90-91.)  On March 30, 2001, J.O. was placed in a bedroom with Michael Bryan.  (*Id.* at p. 91.)

In June of 2001, however, this sleeping arrangement changed.  At K.B.'s request K.B. was moved into J.O.'s room, and Michael was placed in a room with R.S.  (Pls.' Ex. Q at p. 54-55.)  Subsequent thereto, J.O. repeatedly sexually assaulted K.B.  (Defs.' Ex. L at pp. 20, 44, 46.)

2.  *The abuse is reported*

On Sunday evening, August 12, 2001, K.B. first told his parents that he had been molested by J.O.  (Pls.' Ex. I (Vol. I) at p. 54.)   At that time K.B. was nine years old and J.O. was fourteen.  (Pls.' Ex. Q at p. 64; (Defs.' Ex. CC at EC 4.)  He first reported that J.O. had grabbed his testicles.  (Pls.' Ex. I (Vol. I)  at p. 61).  The Bryans recognized that this incident needed to be reported but decided to wait until the next day to tell OCY representatives at their

---

[6] Parenthetically, a reasonable inference to be drawn from the defendants' alleged directive to the Bryans to place J.O. in a separate bedroom and utilize an alarm on his door is that the Defendants believed that J.O. continued to pose a threat.

previously scheduled in-home meeting.  In the meantime, they told J.O. he could stay in their home overnight but they insisted that the alarms[7] be placed on his bedroom door and in the hallway outside his room.  (*Id.* at p. 58.)

Ms. Bryan reported the allegations of abuse the following day, Monday, August 13, 2001 at her meeting with Wraparound coordinator Barry Kohler and caseworker Cindy Lewis.  (*Id.* at p. 43.)  According to Paul Bryan, when Barry Kohler heard the allegation that J.O. had sexually abused K.B, he "was thumbing through his file on J.O. and said, there's a history of this."  (Pls.' Ex. Q at p. 68.)  J.O. was removed from the Bryan home that day.  (Pls.'s Ex. I (Vol. I)  at p. 62.)

Lewis testified that prior to that she was unaware that J.O. and K.B. were sharing a room.  (Pls.' Ex. D at p. 49.)  It was her understanding that Baxter had told the Bryans that J.O. was to have his own bedroom.  (*Id.* at p. 50.)  Kohler also believed that J.O. was sharing a room with Michael and he recalled that an OCY employee – either Baxter or Skalko -- told the Bryans at a team meeting that J.O. should room with Michael.  (Pls.' Ex. K at p. 30, 47.)

Later that week the Bryans brought K.B. to a therapy session with Dr. Denniston, during which K.B. disclosed that the sexual abuse by J.O. was far worse than he initially reported, and in fact, J.O. had raped him orally and anally and had threatened to kill the Bryans if K.B. told them what had happened.  (Pls.' Ex. I (Vol. I) at p. 65.)  K.B also reported that the abuse occurred on more than one occasion.  (*Id.* at p. 73.)  At his deposition, K.B. testified that J.O. had molested him fifteen to twenty times.  (Pls.' Ex. L at  p. 20.)  On one occasion, he reported that J.O. had pulled out a knife and told him "if you tell anyone, I'm going to kill you or the family." (*Id.* at p. 21.)

---

[7]   Paul Bryan testified that the alarms had been purchased for K.B., not J.O., and that the Bryans had never been given an alarm to use for J.O.  (Pls.' Ex. Q at p. 66.)

After the abuse allegations were made, Lewis filed a report with Judge Cunningham in which she expressed concern for the safety of the younger children in the home and stated that an evaluation of J.O. by the Sexual Abuse Initiative was indicated.  (Pls.' Ex. D at p. 39.)  The report stated: "J.O.'s history reveals past concerns of sexual victimization, sexual behaviors and sexual perpetration that has never been fully explored." (*Id.*)

On October 18, 2001, the two younger pre-adoptive children, R.S. and T.S. were removed from the Bryans' home because the Bryans had been accused of abuse by omission by virtue of the fact that they had allegedly failed to prevent the sexual abuse suffered by K.B. (Pls.' Ex. I (Vol. I) at p. 72-73.)

On September 5, 2003, after a hearing at which Bryans were represented by an attorney, administrative Judge Maria Greco made a finding of fact that the Bryans' testimony that they had no knowledge of J.O.'s history of acting out sexually or engaging in sexually inappropriate behavior was not credible or believable, citing multiple instances where she concluded that J.O.'s sexually inappropriate behavior was discussed with Ms. Bryan.  (Defs.' Ex. CC at EC 1 through EC 11.)  She recommended that the Bryans' appeal of an OCY decision to file an "indicated" report of child abuse with the ChildLine Registry be denied.  (*Id.* at EC 3.)   The Department of Public Welfare Bureau of Hearings and Appeals adopted this recommendation on December 11, 2003, and the decision was upheld by the Secretary of the Department of Public Welfare.  On March 14, 2005, the Commonwealth Court of Pennsylvania reversed on the basis that the requisite CY-48 report had not been filed within the 60 days required by statute.  (Defs.' Ex. DD.)   The Department of Public Welfare was directed to expunge the report of indicated abuse. (*Id.*)  The Commonwealth Court did not address the findings of fact made by the ALJ.

Plaintiffs have submitted an affidavit of Kathleen Faller, an expert in the field of social work, child abuse, and the standard of care required of child welfare agencies.  (Pls.' Ex. A.)  Dr. Faller has opined that the OCY defendants created a danger by placing J.O. in the Bryan home, that they had an affirmative duty to provide accurate and complete information concerning the history of sexual aggression by J.O., and that they failed in that regard.  (*Id.*)

### D. Supervisory Defendants

1. *Paul Cancilla*

Defendant Paul Cancilla (hereinafter, "Cancilla"), now retired, was the OCY director of foster care services from 1992 through February 2003.  He was Baxter's supervisor at the host family program of OCY.  (Pls.' Ex. B at p. 27; Pls.' Ex. J at p. 14.)  He had no responsibility for making any placement decisions.  (*Id.* at p. 137.)  He did not directly work with children although occasionally he reviewed a case file.  (Pls.' Ex. J  at pp. 35-36.)  He did not work on J.O.'s case file. (*Id.* at p. 43).  Cancilla was involved in the closing of the Bryans' foster home to further placements after the Department of Public Welfare investigated them for abuse by omission for failing to protect K.B.  (*Id.* at p. 39.)

 Cancilla's deposition testimony generally covered the subject of OCY policy and procedure. Cancilla testified that it was OCY policy to disclose as much information as possible, within the confines of victim confidentiality,  to the foster parents concerning a potential foster child's past sexual activity and behaviors. (*Id.* at p.  56.)  "If there were problems that the kid had related sexually and he was involved in treatment for it or he had a past history of acting out sexually . . . that would . . .be communicated to the foster parents."   (*Id.* at p. 59.)

Cancilla admitted that the Bryans had made it clear to Baxter that they did not want a child with severe sex offending history or a history of fire setting.  (*Id.*  at p. 140.)   It was OCY

policy to honor the wishes of foster parents who requested that they not be given a foster child who exhibited certain behaviors.  (*Id.* at p. 138.) He explained that placing a "sexually offending" foster child in a home with other minor children is acceptable under certain circumstances, so long as a the home was adequately structured.  (*Id.* at pp. 65-66.)  A "structured setting" would include: alarms on doors, strict instruction that the child was not to be left alone with any younger children, foster parent training, respite care for the foster parent to give them sufficient breaks, treatment services in the community, and Wraparound services. (*Id.*)

2.  *Carmen Merritt*

Defendant Carmen Merritt was the supervisor of foster care at OCY. (Pls.' Ex. B at p. 25.)  He shared responsibility with Cancilla in supervising Baxter.  (Pls.' Ex. J at pp. 34-35.) Merritt further explained that at the time the decision was made to place J.O. in the Bryan home, Skalko's supervisor was Carla Krott.  (Pls. Ex. C at p. 144.)  Like Cancilla, Merritt had no involvement with J.O. until August 2001, when Lewis, who replaced Skalko as caseworker for J.O., advised Merritt of K.B.'s allegations of abuse.  (*Id.* at p. 27.)

Merritt authored the OCY manual relating to policies and procedures.  (*Id.* at p. 20.)  He defined a "risk assessment" as determining whether, under all the facts, a child should be separated from his parents as a result of a significant risk of further neglect or abuse, or whether interventions could succeed in keeping a child in his or her home. (*Id.* at p. 125.)  He explained that a risk assessment can occur at any point in the child's history and was performed whenever a child was about to have a major change.  (*Id.*)   Merritt characterized J.O.'s treatment team meetings as a "risk assessment." (*Id.*)  At some point, he explained, the OCY moved away from using a document that was entitled "risk assessment" and instead simply used a risk assessment model in the form of court summaries prepared by caseworkers.  (*Id.* at p. 130.)  Merritt further

explained that if there was no risk assessment authored by an OCY employee regarding J.O., it

would not be a violation of OCY policies, procedures, manual or other regulations.

Merritt explained that a "safety plan"[8] is an outline of specific concerns, although perhaps

not all concerns, that a caseworker and supervisor would have about a particular child.

According to Merritt, there was no requirement that a safety plan be prepared for each case.  (*Id.*

at p. 130-31.)  A safety plan was not necessarily a separate document.  Rather, like a "risk

assessment," it could appear as part of a court summary.  (*Id.* at p. 131.)

Using J.O.'s case in point Merritt explained:

And the safety plan would address specific items for the foster family to follow, so that it
maximizes the chances for success of controlling and managing the child's behavior, so that he
didn't further injure himself or anybody else in the home.

A safety plan would be, for this particular child with these issues, a separate bedroom
would definitely be in the right direction to go.  That is less opportunity for him to molest, attack,
rape, whatever, any other child, if he's in his own room.  It doesn't totally negate it, it reduces it.
It also requires that the foster parent have extra level of supervision in their mind; thinking,
caring, knowing, exploring.  If things don't sound right, explore, don't let it go.

Even a safety plan could include putting a safety alarm on the door.  So that if he leaves
the room, the people in the family are notified that he's out of his room.  Don't let it go,
investigate.  What is he doing; is he going to the refrigerator, is he going to the bathroom, or is
he going to another child's room.

That's an example of what a safety plan would entail.  And it was my understanding,
from what I was told, that that was put in place.  At least a verbal understanding.  I don't know if
it's in writing, but I know that all the verbal information I have indicates that that was the safety
plan for this particular child.

(*Id.* at pp. 132-33.)  Because OCY had identified J.O.'s problems, and recommended treatment

for those problems, in the form of an individualized treatment summary and a court-ordered

summary, in Merritt's view, OCY had offered a safety plan for J.O.  (*Id.* at pp. 133, 134.)

---

[8] Baxter was asked a series of questions related to "Written Safety Plans." (Pls.' Ex. H. at 173.)  She understood
these to be typically provided for children who were deemed to remain in their biological home who needed a plan
to keep them safe – not for foster children like J.O. who were abandoned or were residential children.  (*Id.*)

## III. DISCUSSION

Plaintiffs claim that the OCY defendants had knowledge that J.O. had a history of sexually abusive and physically violent behavior and yet failed to adequately advise them as to his background and propensities.  They contend that by placing J.O. in their household, without adequately advising them as to the risk, the OCY defendants were deliberately indifferent to K.B.'s safety and, as a consequence, his constitutional rights were violated.

### A. <u>Collateral Estoppel</u>

Prior to discussing the Defendants' contention that the Plaintiffs' § 1983 claim fails because the record does not support a state-created danger theory, we address the Defendants' initial contention that the Plaintiffs should be collaterally estopped from pursuing their § 1983 claim.  The Commonwealth Court vacated the DPW decision on a procedural technicality, (Defs.' Ex. DD), and therefore, there was no review of the sufficiency of the evidence and no valid and final judgment.  *Jean Alexander Cosmetic, Inc. v. L'Oreal, USA, Inc.*, 458 F.3d 244, 249 (3d Cir. 2006) ("When an issue of fact or law is actually litigated and ***determined by a valid and final judgment***, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim") (quoting Restatement (Second) of Judgments § 27 (1982) (emphasis added).  The only issue that was actually litigated and determined by a valid and final judgment, in our view, was that the DPW had failed to file the CY-48 in a timely fashion.  The Commonwealth Court noted that "[it] need not address the remaining issues," thus expressly avoiding any comment on the sufficiency or quality of the testimony proffered by the  OCY Defendants in support of their assertion that the Bryans knew that J.O. constituted a danger to K.B.

The doctrine of res judicata "prevails as long as the underlying judgment remains in full and operative effect and has not been disturbed." 47 Am. Jur.2d Judgments § 532 (2d. Ed. 2012). "On the other hand, a judgment is inoperative as res judicata where it has been … vacated . . . [or] reversed by an appellate court." *Id.* "The rule that a judgment has no res judicata effect after reversal applies where the reversal was based on procedural grounds, even where the reviewing court specifically held that the evidence supported the verdict and a further appeal is pending." *Id. See also Aguillard v. McGowen*, 207 F.3d 226, 229(5th Cir. 2000) (when the appellate court reverses a judgment, the finality necessary for claim or issue preclusion is eliminated).

Accordingly, we will deny Defendants' motion on the basis of collateral estoppel.

## B. <u>Federal Claims</u>

Plaintiffs' federal claims in this case are brought under 42 U.S.C. § 1983, which provides a cause of action to:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws ...

42 U.S.C. § 1983. To prevail under 42 U.S.C. § 1983, a plaintiff must prove that s/he suffered the deprivation of a constitutional or federal rights by a person acting under color of state law. *Mark v. Borough of Hatboro,* 51 F.3d 1137, 1141 (3d Cir.1995).

In Count I of the Complaint, Plaintiffs allege that all the named Defendants violated J.O.'s right to substantive due process under the Fourteenth Amendment to the U.S. Constitution, naming as defendants OCY,  Cancilla, Merritt, Skalko, Baxter, Sullivan and Lewis.  It  is undisputed that all the named Defendants are state actors for purposes of § 1983. The focus, therefore, is whether the record evidence supports the existence of a constitutional tort.

**1. Count I: Substantive Due Process Violation**

 The Due Process Clause of the Fourteenth Amendment provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. Thus, individuals have a constitutional liberty interest in personal bodily integrity that is protected by the Due Process Clause of the Fourteenth Amendment. *Phillips v. County of Allegheny*, 515 F.3d 224, 235 (3d Cir. 2008).

### a. State Created Danger Theory

Under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), the Due Process Clause does not generally impose upon the state an affirmative obligation to protect its citizens from harm inflicted by private individuals. An exception to this general rule exists, nonetheless, under what is known as the "state-created danger" theory. *Phillips*, 515 F.3d at 235. This theory holds that government actors can be liable under § 1983 for private harm which befalls a citizen where "state authority is affirmatively employed in a manner that injures [the] citizen or renders him 'more vulnerable to injury from another source than he ... would have been in the absence of state intervention.' " *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006) (quoting *Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir. 2003)). In *Bowers v. De Vito*, 686 F.2d 616, 618 (7th Cir. 1982), Judge Posner famously summarized the theory behind state-created danger liability by noting that, "[i]f the state puts a man in a position of danger from private persons and then fails to protect him, it will not be heard to say that its role was merely passive; it is as much an active tortfeasor as if it had thrown him into a snake pit." 686 F.2d at 618.

To establish a claim under the "state-created danger" theory in this circuit, the following elements must be shown to exist: (1) the harm ultimately caused to the victim was foreseeable

and fairly direct; (2) the state actor acted with a degree of culpability that shocks the conscience; (3) a relationship between the state and the plaintiff existed such that the plaintiff was a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions, as opposed to a member of the public in general; and (4) a state actor affirmatively used his or her authority in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all. *Bright*, 443 F.3d at 281.

The first element—that the harm ultimately caused was foreseeable and fairly direct—necessarily entails allegations of "an awareness on the part of the state actors that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips*, 515 F.3d at 238. *See also D.N. ex rel. Nelson v. Snyder*, 608 F.Supp.2d 615, 625 (M.D. Pa. 2009). In addition to the foreseeability component of the analysis, we must assess whether the harm "is a 'fairly direct' result of the defendant's acts." *Phillips*, 515 F.3d 239. "This inquiry essentially asks whether the alleged misconduct and the harm caused were "too attenuated" to justifiably hold the defendant liable." *D.N. ex rel. Nelson*, 608 F.Supp.2d at 625 (citing *Phillips,* 515 F.3d at 238).

With respect to the second element of the "state-created danger analysis," to wit, that the state actor act with a degree of culpability that "shocks the conscience," the "exact degree of wrongfulness necessary to reach the 'conscience-shocking level depends upon the circumstances of a particular case.'" *Miller v. City of Philadelphia,* 174 F.3d 368, 375 (3d Cir. 1999). Where a state actor has the time to deliberate about his actions and is not under pressure to make hurried judgments, the state actor's conduct will be sufficiently "conscience shocking" if it displays a deliberate indifference toward a substantial risk of serious harm to the plaintiff. *See Navolio v.*

*Lawrence County*, 406 Fed.Appx. 619, 624 (3d Cir. 2011) ("In a case where state actors have the time to make unhurried judgments, the level of culpability required to shock the conscience is deliberate indifference.") (quoting *Sanford v. Stiles*, 456 F.3d 298, 309 (3d Cir. 2006)).

The third element requires that the plaintiff show "a relationship between the state and the plaintiff" such that the plaintiff was "a foreseeable victim of the defendant's acts, or a member of a discrete class of persons subjected to the potential harm brought about by the state's actions." *Smith v. School Dist. of Philadelphia,* Civil Action No. 07–2080, 2009 WL 667455 at *6 (E.D. Pa. Mar. 10, 2009) (quoting *Bright*, 443 F.3d at 281). This requirement "contemplates some contact such that the plaintiff was a foreseeable victim of the defendant's acts in a tort sense." *Id.* (quoting *Kneipp v. Tedder,* 95 F.3d 1199, 1209 n. 22 (3d Cir. 1996)).

The fourth element of the state-created danger analysis can be broken down into three necessary conditions, to wit: (i) a state actor exercised his or her authority; (ii) the state actor took an affirmative action; and (iii) this affirmative act created a danger to the citizen or rendered the citizen more vulnerable to danger than if the state had not acted at all. *Ye v. United States,* 484 F.3d 634, 639 (3d Cir. 2007); *Bright,* 443 F.3d at 281–82.

The failure by a plaintiff to establish any of the foregoing elements will preclude a viable state-created danger claim. *See Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 914 (3d Cir. 1997) (for purposes of state-created danger claim, court did not need to decide whether the decedent and others who were present in school where decedent was fatally shot were a sufficiently discrete group of persons who could have been foreseeable victims of an armed and dangerous intruder, since plaintiff could not satisfy the remaining three elements of his claim); *Smith*, 2009 WL 667455 at *3 ("A plaintiff's failure to satisfy any of the four elements defeats his state-created danger claim.") (citing *Morse, supra*). To avoid entry of a summary judgment in

this case, therefore, Plaintiffs must present evidence which shows there is a genuine dispute issue of material fact as to each element of their state-created danger claim. See Fed. R. Civ. P. 56(c); *Smith,* 2009 WL 667455 at *3.

In addition, each Defendant's potential liability must be predicated on the basis of his or her own personal knowledge and actions relative to J.O.'s case, because liability under § 1983 cannot be premised on theories of vicarious liability or respondeat superior. *See Ashcroft v. Iqbal*, 556 U.S.662, 129 S.Ct. 1937, 1948, 173 L.Ed.2d 868 (2009) (noting that, because vicarious liability is inapplicable in a § 1983 suit, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution") (assessing a motion to dismiss under Fed. R. Civ. P. 12(b)). Accordingly, this Court will consider the sufficiency of the Plaintiffs' evidence as it pertains to the respective conduct of each named Defendant.

### (i). Foreseeability of Harm

The first element of the state-created danger theory requires a showing that the harm ultimately caused to the K.B. was foreseeable and fairly direct. *Bright*, 443 F.3d at 281. It is Plaintiffs' contention that the Defendants placement of J.O. in their home, without full disclosure of J.O.'s background, displayed a willful disregard for K.B.'s safety.  From the very beginning, it is undisputed that OCY employees were on notice of allegations of sexually inappropriate behavior by J.O.  As previously discussed, in her intake opening document, Steves noted that J.O.'s parents reported he was fascinated with fire,  had sexually abused a half-sister, had sexually abused a niece in North Carolina, and had threatened to "blow things up," "shoot people" and "stab people."  Early on, caseworker Rose of the Sexual Abuse Unit of OCY

questioned whether foster care was even a suitable option for J.O., given the risks he posed to himself "and others."

The OCY Defendants rely heavily on the findings of Dr. Troncone, a licensed psychologist, who reported on July 24, 1998 that in his expert opinion, J.O. was "not a sexual perpetrator." Dr. Troncone's findings, however, were rendered some two and a half years prior to J.O.'s placement with the Bryans. In reaching his conclusion, Dr. Trocone did not have the benefit of the multiple incidents of sexually inappropriate behavior by J.O. while in the foster care system. From 1998 through March 2001 OCY documented evidence that J.O. was sexually acting out and physically aggressive. As a consequence, J.O. had been moved from one foster home to another. There are records that he continued to struggle with impulse control and acting out. Despite Dr. Troncone's conclusion, OCY had reason to believe that J.O. had sexually assaulted his niece and half-sister, which one employee admitted "had never been fully explored."

The defendants also rely on the fact that there had not been any adjudication, in the strict legal sense, that J.O. was guilty of sexual abuse or had been adjudicated a sexual offender or sexual perpetrator, or that he had raped or sexually abused anyone while he was in OCY's care. Yet there is ample evidence in the record sufficient to support the reasonable inference that OCY should have known that J.O. had the *propensity* to act in such a manner. In order to establish the foreseeability element of a state-created danger claim the Plaintiffs must demonstrate "an awareness on the part of the state actors that rises to the level of actual knowledge or an awareness of risk that is sufficiently concrete to put the actors on notice of the harm." *Phillips*, 515 F.3d at 238. *See also D.N. ex rel. Nelson*, 608 F.Supp.2d at 625 (M.D. Pa. 2009); *Gremo v. Karlin*, 363 F.Supp.2d 771, 784 (E.D. Pa. 2005) ("A harm is foreseeable when a state actor has

actual awareness, based on concrete information, of a risk of harm to an individual .... such that the actor is on notice that his or her act or failure to act significantly enhances that risk of harm.").

The record evidence supports plaintiff's claim that defendants Skalko, Baxter, and Lewis[9] had an awareness of a risk that was sufficiently concrete to put them on notice of J.O.'s potential for sexual assault and rape. These defendants knew that the Bryans did not want a sexual offender.  They were also aware that there were younger children in Bryan house.  They also were aware that J.O. had a long history of physically aggressive behavior and sexual acting out. They admit that they believed that door alarms and separate bedrooms were necessary.

For all of the above reasons, the Court finds that the Plaintiffs have raised a triable issue of fact as to the foreseeability prong of the state-created danger test.

### (ii). Deliberate Indifference

The Third Circuit has stated that, "in the state-created danger context, deliberate indifference may not require a state actor's actual knowledge of a risk of harm 'when the risk is so obvious that it should be known.' " *Navolio v. Lawrence County*, 406 Fed.Appx. at 624 (quoting *Sanford*, 456 F.3d at 309).  Such a patently obvious risk of harm to the victim is established on this record largely for the same reasons that support a finding of foreseeability. As previously discussed, the record, when viewed in the light most favorable to the Plaintiffs, reflects an ongoing pattern of assaultive and sexually inappropriate behavior by J.O.  The Plaintiffs contend, and we must accept for the purposes of resolving this motion, that they were

---

[9] Defendant Brigitte Sullivan assumed the position previously held by Baxter, i.e. Foster Care Coordinator, after K.B. reported  the abuse and  J.O. had been removed from the Bryan home.  (ECOCY Defs.' Mot. Summ. J. [ECF 143] at 19-20) (citing Dep. Brigitte Sullivan at pp. 99-100.)  In their Memorandum in Opposition [ECF 161], the Plaintiffs do not take issue with Defendants' characterization as to Sullivan's lack of involvement.  There is no dispute on this record, therefore, that Sullivan had no involvement in the placement of J.O. either as part of the host family program or in connection with the foster care placement.  Consequently, given her complete lack of involvement, her motion for summary judgment will be granted.

not fully and meaningfully informed as to J.O.'s background, particularly relative to his sexual misconduct.  In addition, the Bryans dispute that they were advised by the OCY defendants to place an alarm on J.O.'s door or to avoid placing J.O. in K.B.'s room.  There is also evidence to support Plaintiffs' contention that they were actively mislead by the representation that J.O. was "doing well" and was "a nice kid."

In sum, we find on this record that a reasonable jury could conclude that the conduct of the defendants Skalko, Baxter and Lewis was deliberately indifferent to a patently obvious risk of harm to K.B.[10]

### (iii).  Foreseeable Victim

The third element is easily satisfied because K.B. is well within a class of individuals uniquely vulnerable to harm at the hands of an abusive foster child.  The OCY does not appear to contest this third prong and we conclude that it has been met.

### (iv). Affirmative Acts

---

[10] In his concurring opinion of August 18, 2008, Judge McKee of the United States Court of Appeals observed:

I believe the district court erred in concluding as a matter of law that the conduct alleged "does not rise to the level of 'shocking the conscience.'" Dist. Ct. Op. at 22 n.3 (citing *Scheiber v. City of Philadelphia*, 320 F.3d 409, 418 (3d Cir. 2003). "[W]here deliberation is possible and officials have the time to make unhurried judgments, deliberate indifference is sufficient" to satisfy the culpability requirement for a viable state-created danger claim. *Sanford*, 456 F.3d at 309 (footnote and internal quotation marks omitted).  *See also Nicini v. Morra*, 212 F.3d 798, 811(3d Cir. 2000) (finding that deliberate indifference is the appropriate culpability standard for "special relationship" claims brought in the foster care context). I simply cannot agree that no reasonable juror would find that placing a known sexual abuser in a home with minor children, with no warning to the foster parents (and with reassurances), is tantamount to "deliberate indifference." Rather, I believe a reasonable jury could quite easily conclude that such conduct "shocks the conscience." As the Bryans quite correctly note, it is "shocking" that a "government employee would knowingly place a sexual predator into a home with a nine-year-old unsuspecting child, and give the [foster parents] a false document, which omits the predatory history of the child."

[ECF No. 63.]

We must determine whether the individual defendants affirmatively used their authority

in a way that created a danger to J.O. or rendered him more vulnerable to danger. *Bright*, 443

F.3d at 281. Defendants rely on two cases in support of their contention that they did not engage

in affirmative acts: *Kaucher v. County of Bucks*, 455 F.3d 418 (3d Cir. 2006) and *Bennett v.*

*City of Philadelphia*, 499 F.3d 281 (3d Cir. 2007).

In *Kaucher,* a corrections officer and his wife alleged that they contracted a disease due

to the prison affirmatively creating dangerous conditions and affirmatively misrepresenting

dangers. *Id.* However, the United States Court of Appeals for the Third Circuit rejected these

arguments, because "at base, both aspects of their claim allege failures to take actions sufficient

to prevent the Kauchers' infections." *Id*. at 432. The court then reiterated that "failures to act

cannot form the basis of a valid § 1983 claim." *Id.* at 433 n. 11. Further, while the prison did

take an affirmative act in distributing a memorandum discussing (and perhaps understating) the

degree of infection in the prison, it did not constitute a due process violation because "the

memorandum was not the 'but for cause' of the Kauchers' infections"; rather, "[t]here had

always been cases of staph infections at the jail." *Id.* at 434.

In *Bennett*, the Third Circuit Court of Appeals reiterated this principle. 499 F.3d 281 (3d

Cir. 2007). Bennett involved a claim brought under § 1983 against the City of Philadelphia, its

human services agency and several individual agents by the surviving siblings of a child who had

been beaten and killed after her mother entrusted all of the children to an unfit and abusive care-

giver. A parallel suit was brought by the deceased child's estate. The decedent's siblings asserted

a state-created danger claim on the theory that, by closing its dependency case file on the

children, the agency had rendered the children more vulnerable to harm by their mother and her

acquaintances because it had allegedly cut the children off from a private source of aid.

Upon reviewing the elements of a state-created danger claim, the *Bennett* court noted that it had consistently adhered to the pronouncements in *DeShaney* by requiring plaintiffs to allege affirmative acts on the part of state officials that constitute a "but for cause" of the risks they faced; mere "failures to act," the court noted, cannot form the basis of a valid § 1983 claim. 499 F.3d at 287–88 (discussing *Kaucher*, 455 F.3d at 433 n. 10 and other supporting case law.) The court recounted its prior ruling in *Bright*, wherein it had rejected the theory that a police officer's knowledge of a danger to the victim by itself creates an affirmative duty to protect the victim from that harm. "No affirmative duty to protect arises from the State's knowledge of the individual's predicament," the court had written. *See* 499 F.3d at 288 (quoting *Bright*, 443 F.3d at 284). Rather, "[l]iability requires affirmative state action; mere 'failure to protect an individual against private violence does not violate the Due Process Clause.'" *Id.* The *Bennett* court concluded that the record would not support the contention that the agency had used its authority to create an opportunity for the children to be abused that would not have existed absent its intervention. 499 F.3d at 289. Nor, it found, had "action in the constitutional sense" been taken by the children's case worker, since nothing he did was the "but for" cause of harm to the decedent child. *Id.*

In contrast to *Kaucher* and *Bennett*, the Defendants' allegedly deliberately indifferent conduct in this case is not premised on a mere failure to act. We begin by observing that J.O. would never have been placed with the Bryans, first with the host family program and ultimately in foster care, without the affirmative acts of the OCY Defendants. Indeed, the placement could not have occurred in the absence of OCY petitioning the Court for approval of J.O.'s placement. A reasonable jury could conclude (to slightly alter Judge Posner's analogy) that rather than toss J.O. into the "snake pit" the OCY defendants tossed the "snake" in with J.O. *Bowers*, 686 F.2d

at 618.  But for that placement, allegedly accompanied by the failure to fully apprise the Bryans

of the full nature of J.O.'s past misconduct and potential risk, a reasonable jury could conclude

that K.B. would not have been assaulted

We conclude therefore that the plaintiffs have produced sufficient evidence to raise a

triable issue of fact as to the fourth prong of the state-created danger analysis.

### b. Special Relationship Theory

Alternatively, Plaintiffs base their § 1983 claims on the contention that the Defendants

were in a "special relationship" with K.B.  They contend that by placing foster children in their

home, the individual defendants entered into a special relationship K.B., which included an

affirmative duty to protect him.

A state's failure to protect individuals against private violence does not constitute a

violation of due process.  *Nicini v. Morra*, 212 F.3d 798, 807 (3d Cir. 2000.)  In *Nicini*, the Third

Circuit Court of Appeals held that "when the state places a child in state-regulated foster care,

the state has entered into a special relationship with that child which imposes upon it certain

affirmative duties," the failure to perform which "can give rise, under sufficiently culpable

circumstances, to liability under § 1983." 212 F.3d at 808. The Court went on to explain:

We recognize that the analogy between foster children on the one hand and prisoners
and institutionalized persons on the other is incomplete. For example, foster children,
especially older ones, enjoy a greater degree of freedom and are more likely to be able to
take steps to ensure their own safety. Nonetheless, any distinctions between children
placed in foster care and the prisoners at issue in *Estelle* or the institutionalized mentally
retarded persons at issue in *Youngberg* are matters of degree rather than of kind. See
Norfleet [By and Through Norfleet v. Arkansas Dept. of Human Services], 989 F.2d [289,
292 (8th Cir. 1993)] (although there is a closer relationship between the state and
prisoners than between the state and foster children, "the situations are sufficiently
analogous"). In each of these cases the state, by affirmative act, renders the individual
substantially "dependent upon the state ... to meet [his or her] basic needs." D.R., 972
F.2d at 1372.

*Id.*

41

In *Nicini,* the plaintiff was a boy who had been placed with a family through the New Jersey Division of Youth and Family Services and later suffered sexual abuse at the hands of one of the family members. The case did not involve foster-care placement in the strict sense because the boy had come to stay with the family on his own initiative and the family had not been officially approved as either a foster or para-foster family. Importantly, however,

> Nicini was in DYFS custody throughout the relevant period. Furthermore, the record is replete with evidence that Nicini was substantially dependent upon DYFS and that DYFS acquiesced in Nicini's stay at the Morra home. At least by October 10, 1990, when Nicini's father signed a foster care placement agreement, DYFS was able to arrange for his foster placement. At some point, the Superior Court of New Jersey awarded custody of Nicini to DYFS and DHS. App. at 136. Nicini was thereafter placed on several occasions with DYFS-approved foster parents and with relatives. It also appears that after the police located Nicini at the Morra home and took him to JFK, DYFS returned him to their home over the objections of his aunt and his father.

*Id.* at 809. Under these circumstances, the Court of Appeals found Nicini's situation "sufficiently analogous" to that of a foster care placement such that it fell within the "special relationship" exception to *DeShaney. Id.*

Here, the Plaintiffs' state-created danger theory fails because K.B. was not, in any meaningful sense, in state custody during the time that the abuse occurred. He was not subjected to any restraints on his liberty by the OCY defendants.[11]

### c.  Qualified Immunity

The doctrine of qualified immunity "hold[s] that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate  clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727,

---

[11] If, for instance, K.B. had been placed with a foster family by OCY prior to his adoption, and was assaulted by a member of that family, a special relationship sufficient to impose a constitutional duty on the part of the OCY to protect him would exist.  *S.B. ex rel. D.M. v. City of Philadelphia*, 2007 WL 3010528 (E.D. Pa. 2007).

73 L.Ed.2d 396 (1982). The doctrine recognizes "the need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority." *Id.* at 807, 102 S.Ct. 2727 (internal quotations and citation omitted).

In determining whether the individual OCY officials are entitled to claim qualified immunity, we engage in a three-part inquiry: (1) whether the plaintiffs alleged a violation of their statutory or constitutional rights; (2) whether the right alleged to have been violated was clearly established in the existing law at the time of the violation; and (3) whether a reasonable official should have known that the alleged action violated the plaintiffs' rights. *Rouse v. Plantier*, 182 F.3d 192, 196-97 (3d Cir. 1999). Under the first part of the inquiry, the Bryans allege a violation of their federal statutory and constitutional rights. The second and third parts are related, and involve an inquiry into the "objective legal reasonableness" of an official's action, assessed in light of legal rules that were "clearly established" at the time the officials took the action. *Anderson v. Creighton*, 483 U.S. 635, 639, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (internal quotations and citation omitted). Rights may be clearly established even though the precise conduct at issue has not yet been declared unlawful. *See id*. at 640, 107 S.Ct. 3034. Throughout the inquiry, the officials' subjective intent is irrelevant. *See id*. at 639, 107 S.Ct. 3034.

At the time of the alleged violation herein, the law was clear that state actors can be individually liable for due process violations when they have created the danger. *Kneipp v. Tedder*, 95 F.3d 1199, 1205-09 (3d Cir. 1996). In that case, six years prior to J.O.'s placement with the Bryans, the United States Court of Appeals for the Third Circuit first adopted the state-created danger theory, confirming that liability may attach where the state acts to create or enhance a danger that deprives the plaintiff of his or her Fourteenth Amendment right to substantive due process. *Id*. at 1205. As discussed above, we have concluded that the Plaintiffs

have raised a triable issue of fact as to whether K.B.'s substantive due process rights were violated. As reflected by the opinion in *Kniepp*, the state created danger theory was firmly established. The individual defendants knew or should have known that their alleged affirmative conduct was violative of K.B.'s constitutional rights. We conclude, therefore, that the individual defendants are not entitled to avail themselves of the defense of qualified immunity.

### d. Municipal Liability

Plaintiffs contend that OCY had a policy, practice and custom of performing risk assessments and safety plans and that its abandonment of that practice, coupled with the alleged failure to disclose information contained therein, subjects it to municipal liability pursuant to § 1983. "When a suit against a municipality is based on § 1983, the municipality can only be liable when the alleged constitutional transgression implements or executes a policy, regulation or decision officially adopted by the governing body or informally adopted by custom." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Monell v. Dept. of Social Servs. of City of New York,* 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). "Thus, although the municipality may not be held liable for a constitutional tort under § 1983 on the theory of vicarious liability, it can be held responsible as an entity when the injury inflicted is permitted under its adopted policy or custom." *Id.*

To withstand summary judgment, plaintiffs must demonstrate not only the existence of a policy or custom, but also its connection to the alleged constitutional injury. A government's policy is established when a "'decision maker possess[ing] final authority to establish municipal policy with respect to the action' issues an official proclamation, policy, or edict." *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1480 (3d Cir. 1990) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986)). "A course of conduct is

considered to be a 'custom' when, though not authorized by law, 'such practices of state officials [are] so permanent and well settled' as to virtually constitute law." *Id.* (quoting *Monell*, 436 U.S. at 690, 98 S.Ct. 2018). *See also Iverson v. City of Philadelphia*, 213 Fed.Appx. 115, 118–19 (3d Cir. 2007).

We conclude that the Plaintiffs have failed to raise a triable issue of fact as to OCY's liability.  Clearly, there was no formal policy to place dangerous children in foster homes without adequate warning to the foster parents.  Nor is there evidence on this record of a *de facto* custom or practice relative to the same.  Merritt's uncontradicted testimony was that there was no requirement that the risk assessment or safety plan be reduced to a formal written document. However, he contended, and the other individual defendants agreed, that all information pertinent thereto would have been shared with the Bryans, either orally or in writing.  While the alleged failure on the part of the individual Defendants to do so might be pertinent to an analysis of their liability, it is irrelevant to OCY's because *respondeat superior* does not apply in a § 1983 claim.  Therefore, summary judgment will be granted in favor of the municipal defendant OCY.

### e. Supervisory Liability Claims

There is no *respondeat superior* liability in the § 1983 context; a defendant must have personal involvement in the alleged wrongs for liability to attach. *Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988) (internal citations omitted). This personal involvement can be shown where a defendant personally directs the wrongs, or has actual knowledge of the wrongs and acquiesces in them. *Id.; A.M. ex rel. J.M.K. v. Luzerne County Juvenile Detention Center*, 372 F.3d 572, 586 (3d Cir. 2004) (noting that "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced in his subordinates' violations").

Actual knowledge "can be inferred from circumstances other than actual sight." *Baker v. Monroe Twp.*, 50 F.3d 1186, 1194 (3d Cir. 1995). Acquiescence is found "[w]here a supervisor with authority over a subordinate knows that the subordinate is violating someone's rights but fails to act to stop the subordinate from doing so, the factfinder may usually infer that the supervisor 'acquiesced' in (i.e., tacitly assented to or accepted) the subordinate's conduct." *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1294 (3d Cir. 1997).

As previously discussed, neither Cancilla nor Merritt had any involvement with J.O.'s placement.  Both Cancilla and Merritt were directors with at least one level of supervisors between them and the caseworkers handling the foster children.  Quite simply, there is no evidence of record which could support a finding of personal involvement on the part of Cancilla or Merritt as neither defendant personally directed any of the conduct challenged by the Plaintiffs, had knowledge of it, or acquiesced in it.  *Rode*, 845 F.2d at 1207.

Accordingly, for the reasons previously discussed, summary judgment will be granted in favor of Cancilla and Merritt.

## C.  State Law Claim of Intentional Infliction of Emotional Distress

Count II of the First Amended complaint alleges, on behalf of K.B. only, intentional infliction of emotional distress against the OCY defendants.  (First Amended Complaint [doc. 83] at ¶¶ 53, 54.)  To state and sustain a claim for intentional infliction of emotional distress plaintiff must allege and show that defendants' conduct was (1) extreme and outrageous (2) intentional or reckless, and (3) caused severe emotional distress. *Livingston v. Borough of Edgewood,* No. Civ. A. 08–812, 2008 WL 5101478 at *6 (W.D. Pa. 2008) (citing *Hargraves v. City of Philadelphia,* 2007 WL 1276937 (E.D. Pa. April 26, 2007)).

The tort of intentional infliction of emotional distress requires a showing beyond the threshold required by deliberate indifference in the §1983 context.  Pennsylvania courts have defined "extreme and outrageous conduct" as conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Hoy v. Angelone,* 554 Pa. 134, 720 A.2d 745, 754 (1998) (citing *Buczek v. First Nat'l Bank of Mifflintown*, 366 Pa.Super. 551, 531 A.2d 1122, 1125 (Pa. Super. Ct.1987)). Liability for intentional infliction of emotional distress is "reserved by the courts for only the most clearly desperate and ultra extreme conduct." *Id*. The challenged conduct is sufficiently extreme and outrageous when "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " *Kazatsky v. King David Mem'l Park*, 515 Pa. 183, 527 A.2d 988, 994 (1987).

The Third Circuit recently dealt with such a claim in *Reedy v. Evanson,* 615 F.3d 197, 231–32 (3d. Cir. 2010) and stated as follows:

While the Pennsylvania Supreme Court has yet to formally recognize a cause of action for intentional infliction of emotional distress, see *Taylor v. Albert Einstein Med. Ctr.*, 562 Pa. 176, 754 A.2d 650, 652 (2000), the Pennsylvania Superior Court has recognized the cause of action and has held that, "in order for a plaintiff to prevail on such a claim, he or she must, at the least, demonstrate intentional outrageous or extreme conduct by the defendant, which causes severe emotional distress to the plaintiff." *Swisher v. Pitz*, 868 A.2d 1228, 1230 (Pa. Super. 2005) (discussing how the Pennsylvania Supreme Court has indicated that, were it to recognize a cause of action for intentional infliction of emotional distress, these would be the requirements necessary for a plaintiff to prevail on such a claim). In addition, "a plaintiff must suffer some type of resulting physical harm due to the defendant's outrageous conduct." *Id.*

*Id.* "It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive

damages for another tort." Restatement (Second) of Torts § 46 cmt. d (1965).  It is for the Court

to determine, in the first instance, whether the actor's conduct can reasonably be regarded as so

extreme and outrageous as to permit recovery. *Dawson v. Zayre Dept. Stores*, 499 A.2d 648, 649

(Pa. Super. 1985). "The requisite 'intention' which one must display for liability to be imposed is

knowledge on the part of the actor that severe emotional distress is substantially certain to be

produced by his conduct." *Hoffman v. Memorial Osteopathic Hospital*, 342 Pa. Super. 375, 492

A.2d 1382 (Pa. Super. 1985) (citing *Forster v. Manchester*, 410 Pa. 192, 189 A.2d 147, 151 (Pa.

1963)).

In support of his claim, K.B.'s counsel cites to *Solomon v. City of Philadelphia*, 1996 WL

20651 (E.D. Pa. January 16, 1996), a case involving sexual harassment in the workplace, where

the court denied a motion for summary judgment as to an intentional infliction of emotional

distress claim brought by former employees for retaliation against them in the form of, *inter alia*,

physical assault, punitive transfers, and searches of their belongings.  The *Solomon* court noted

that the tort has been construed narrowly in Pennsylvania, citing *Shaffer v. National Can Corp*.

565 F. Supp. 909, 914 (E.D. Pa. 1983), and that "there is a relative want of reported cases in

which plaintiffs appear to have ultimately recovered for the intentional infliction of emotional

distress under Pennsylvania law."   *Solomon*, 1996 WL 20651 at *3.  Examples of cases in

which the Pennsylvania courts have found a sufficient basis for intentional infliction of

emotional distress include *Papieves v. Lawrence*, 437 Pa. 373, 263 A.2d 118 (1970) (defendant,

after striking and killing plaintiff's son with automobile, and after failing to notify authorities or

seek medical assistance, buried body in a field where discovered two months later and returned

to parents (recognizing but not adopting section 46)); *Banyas v. Lower Bucks Hosp.*, 293 Pa.

Super. 122, 437 A.2d 1236 (1981) (defendants intentionally fabricated records to suggest that

plaintiff had killed a third party which led to plaintiff being indicted for homicide); *Chuy v. Philadelphia Eagles Football Club*, 595 F.2d 1265, 1273-74 (3d Cir. 1979) (defendant's team physician released to press information that plaintiff was suffering from fatal disease, when physician knew such information was false).

K.B.'s intentional infliction of emotional distress claim[12] fails on this record.   While the acts of the individual defendants could reasonably be viewed as deliberately indifferent, the record could not support a finding that they placed J.O. in the Bryan home with the intent that he assault K.B. and the expectation that K.B. suffer severe emotional distress as a result.   In sum, the alleged conduct here falls short of the very high bar required for the successful prosecution of an intentional infliction of emotional distress claim under Pennsylvania law.   Accordingly, summary judgment is granted as to this claim.

## IV. CONCLUSION

For the reasons set forth above, the Defendants' motion for summary judgment will be granted in part and denied in part. An appropriate order follows.

---

[12] At oral argument, plaintiffs' counsel requested leave to amend the First Amended Complaint so as to add a claim for intentional infliction of emotional distress on behalf of Plaintiffs Bonnie and Paul Bryan.  We will deny the motion for the reasons discussed above.

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

PAUL BRYAN and BONNIE BRYAN,   )
husband and wife, individually and as   )
parents and natural guardians on behalf of   )
their minor child, K.B., and K.B.,   )
  )
      Plaintiffs,   )
  )
    v.   )     C.A. No. 03-259 Erie
  )
ERIE COUNTY OFFICE OF CHILDREN   )
& YOUTH, et al.,   )
  )
      Defendants.   )

## ORDER OF JUDGMENT

AND NOW, to wit, this 22nd day of March, 2012, for the reasons set forth in the accompanying Memorandum Opinion,

It is hereby ORDERED, ADJUDGED, and DECREED that the motion for summary judgment [ECF No. 142] on behalf of Brigitte Sullivan, Paul Cancilla, and Carmen Merritt  is GRANTED in its entirety and JUDGMENT is entered in their favor.

It is further hereby ORDERED, ADJUDGED, and DECREED that the motion for summary judgment [ECF No. 142] on behalf of Erie County Office of Children & Youth is GRANTED in its entirety and JUDGMENT is entered in its favor.

It is further hereby ORDERED, ADJUDGED, and DECREED that the motion for summary judgment [ECF No. 142] on behalf of Defendants Renie Skalko, Cindy Baxter, and Cindy Lewis as to Plaintiffs' state law claim of intentional infliction of emotional distress is GRANTED and JUDGMENT is entered in favor of these Defendants as to that claim.

It is further hereby ORDERED ADJUDGED and DECREED that the motion for summary judgment [ECF No. 142] on behalf of Defendants Renie Skalko, Cindy Baxter, and Cindy Lewis, is DENIED as to K.B.'s substantive due process claim.

s/ Sean J. McLaughlin
United States District Judge

cm:     All counsel of record